UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x

GEORGE GASSER and
GASSER CHAIR COMPANY, INC.,

                  Plaintiffs,

      -against-

INFANTI INTERNATIONAL, INC.,
MARK INFANTI, NANCY APONTE
INFANTI, VITTORIA INFANTI,
MARGUERITA INFANTI, MARIELLA
INFANTI, AMBOY NATIONAL BANK,
GEORGE E. SCHARPF and SANDERS W.
GROPPER, in his capacity as Receiver of
Infanti International, Inc.,

                  Defendants.
-----------------------------------------------x

MEMORANDUM AND ORDER
03 CV 6413 (ILG)

GLASSER, United States District Judge:

        This case, or more accurately, the progenitor of this case, dates back to 1996

when, after a vigorously contested bench trial, the plaintiff was awarded a judgment in

excess of fifteen million dollars against the then defendants Infanti Chair Manufacturing

Company and Vittorio Infanti for infringing the trade dress of a chair manufactured by

the plaintiff. Efforts to satisfy that multi-million dollar judgment have persisted

unabated spawning variegated and complex litigation to recount which in its entirety

would neither meaningfully enlighten nor inform the reader's comprehension of the

discrete issue this Order will address. Reference will be made only to a Memorandum

and Order ("M&O") dated March 2, 2005, which will be summarized in broad outline

and familiarity with its entirety will be assumed. It is that M&O which is the precursor

of the events which gave rise to this motion by which the plaintiffs seek an Order that

would declare the defendants Amboy National Bank ("Amboy") and George P. Scharpf

("Scharpf"), the CEO, Chairman of the Board and President of Amboy, in civil contempt for knowingly and intentionally obstructing and frustrating that Order of this Court.

In an Order dated January 8, 2004, Sanders W. Gropper was appointed temporary receiver ("the Receiver") of Infanti International, Inc. ("the Corporation"), to take "full and absolute" control of its business and property and direct the Corporation and all of its officers, directors and employees, and any other persons associated with it, to immediately transfer to the Receiver sole control of its property or its proceeds. The Order of Appointment further provided that the Receiver shall be solely responsible for the Corporation's finances and keep written accounts itemizing receipts and disbursements, describing the receivership property and designating the depository of Receivership funds.

The subsequent insolvency of the Corporation led the Court in its March 2nd M&O to order the Receiver to conduct a public sale of all of its assets excepting a patent obtained by Vittorio Infanti to a "Versi-Chair," the transfer of which to his daughters was declared by the Court to be a fraudulent conveyance and set aside. The Notice of Sale was directed to advise that the purchase of certain chairs are claimed to violate the trade dress of chairs made by Gasser Chair Company, Inc., and to infringe on Gasser's patents. An announcement to that effect was to be made at the sale. That Order, in addition, directed the Corporation to vacate the building it then occupied which was leased by it from its owner, the Amboy National Bank. Amboy was directed to refrain from interfering with the Receiver's access to the premises and possession of its contents until the public sale was consummated and the Corporation's assets were sold and delivered to the successful purchasers. Pending that event, the Order went on to

2

declare that Amboy shall be deemed a bailee of the assets charged with all the obligations that status implies.

The Receiver retained the G.E.M. Auction Corporation ("G.E.M") to conduct the sale which was held on April 12, 2005. Scharpf was the successful purchaser of the assets of the Corporation with his bulk bid of $200,000. Mark Gasser, the Executive Vice-President of the Gasser Chair Co., was present at the sale and formed the opinion that based on his vast experience in the chair manufacturing business and his familiarity with its business, substantial assets of the Corporation which should have been available for sale, were not. His suspicion that the missing assets were intentionally and wrongfully removed from the premises and withheld from the sale was, he claimed, subsequently confirmed and this motion eventually followed. A hearing was held on November 6, 7 and 8, 2007, at the conclusion of which the Court makes the following findings of fact and conclusions of law.

Mark Gasser, who the Court found to be a scrupulously credible witness testified for the plaintiffs. He stated that, escorted by the Receiver, he visited the corporation's premises on March 18, 2005. Scharpf was also present at the time. His purpose then was primarily to help the Receiver identify items he might object to being sold because they would infringe the trade dress of Gasser's chairs (Tr. 6).

Mr. Gasser visited the premises again on April 11, 2005, the day preceding the auction sale. He was interested in buying a piece of equipment listed on the auctioneer's catalogue and shown in a photograph on its website (Tr. 9, 11 and Px 1). That item was described as a plastic extruder line with cooking line and Gatto end feed (Tr. 13). When he arrived on the premises on that day, however, he found the Gatto puller missing from

the end of the extrusion line (Tr. 16). Mr. Gasser also noted other items missing that would be required to manufacture the types of chairs being made by the Corporation and that were also listed on the auctioneer's website (Tr. 21). He testified that among the items missing were a T-nut driving machine (Tr. 22-23); a routing machine (Tr. 23); ten punch presses were present but with only one die set for them and which were useless without them (Tr. 24); three molds for making foam cushions (Tr. 25); five injection molds were seen when there should have been 15 - 18 of them (Tr. 26-27); rule dies missing in the clicking press (Tr. 27); a complete absence of hand tools (Tr. 28); a complete absence of raw materials, aluminum, used in most of the Corporation's products. Mr. Gasser testified that he asked the Receiver for an explanation for the many missing items, but the Receiver appeared to be unaware of their absence and said he would look into it. The explanation he provided thereafter was that the Gatto puller was repossessed and the T-nut machines were out for repair, both of which proved to be false (Tr. 29, 56, 103).

Punch presses offered for sale on the 12th were without dies and Mr. Gasser testified there should have been ten of them. A welding machine which had been on the premises before the sale was not available at the sale (Tr. 33). Scharpf, who was present at the auction sale, when asked why he, a banker, had such a keen interest in a relatively small chair business, replied that acquiring the business was the only way he could recoup his investment in it, get it up and running and then selling it as a going concern.[1]

---

[1]An in depth inquiry into the inter-relationships between Amboy, Scharpf and Infanti should be revealing. Amboy and Scharpf individually loaned Infanti personally and Infanti International, incorporated by Infanti in 1999, three years after a 15 million dollar judgment was obtained against him and he was declared a bankrupt, hundreds of

(Tr. 334). The Receiver, who was present at the auction, when pressed for an explanation for the items noted to be missing, insisted that everything that was supposed to be sold was there (Tr. 35).

Salvatore Olivo was called by the plaintiffs. He testified that he was an employee of G.E.M. and first visited the Corporation's premises on March 17, 2005. He was escorted by Gary Gropper, took photographs of some of the assets and planned the conduct of the auction sale. The photographs he took were received in evidence and marked Px 1-79. He testified that a photo of what was described as a Tollin machine, taken on March 17, 2005, was not listed on the inventory of the items that were sold at the auction (Tr. 166-67). He testified that no molds or dies were made available for the sale (Tr. 168). He also testified that a variety of other equipment necessary for the manufacture of chairs, such as dies, a welding machine, a T-nut machine, Schwabe presses, a Heister Hi-Lo machine, brand named sewing machines, hand tools, and a power washer were not available at the sale. He also testified that the extrusion machine, which had a Gatto puller as a necessary component part, had been dismantled before it was presented for sale. In short, assets that Mr. Olivo photographed on March 17 and March 18, 2005 were not available for sale at the auction conducted on April 12, 2005 (Tr. 168-202).

Called also to testify for the plaintiffs was Gene Uhlig, the owner of a tool and die business who had built plastic injection molds for Vittorio Infanti (Tr. 229). He also

---

thousands of dollars on a successive series of notes, all of which were in default and most, if not all, were signed by Infanti personally, an insolvent judgment debtor and bankrupt, as guarantor. See, e.g., Gasser v. Infanti International, et al., 353 F. Supp.2d 342 (E.D.N.Y. 2005).

repaired tools and machine parts for him and was familiar with the types of molds and dies that were used by Infanti in the manufacture of chairs (Tr. 230). Mr. Uhlig visited the premises of the Corporation on April 11, 2005, the day before the auction, and walked throughout the entire building. He saw one or two molds or parts thereof sitting on the floor and two dies sitting on a pallet. Knowing that 17-20 molds and perhaps 10 dies were used in connection with the business, he had expected to see many more (Tr. 232-33). He was then shown a series of photographs of molds, dies and other items he identified as necessary components in the manufacture of chairs and testified that he saw virtually none of them on the premises on April 11, 2005, the day before the auction (Tr. 212-255). Significantly, Mr. Uhlig testified that he returned to the premises one week after the auction sale and the molds and dies were back in place and the machines were starting to run again (Tr. 256). He was there in response to calls to change or fix things that were broken. He also identified photographs he took of molds that were brought to his place of business by Mr. Infanti for the purpose of making some changes in them in the months after the auction sale. On one occasion, when delivering a die to the factory, he met Scharpf there who said he wanted Uhlig to continue to work with him. Scharpf also told him why he "booted Vittorio out of the factory." (Tr. 257-58).

The testimony of those witnesses establish beyond the shadow of a doubt that between the Court's Order dated March 2, 2005, directing the sale of the Corporation's assets and the sale conducted on April 12, 2005, a substantial portion of those assets consisting of the essential parts and the machines required for the manufacture of chairs was removed from the premises, virtually denuding them and subverting the Order of this Court.

How did that happen?

On a day in November 2005, during the annual chair industry show at the Javits Convention Center, Mark Gasser met with Vittorio Infanti at the latter's request conveyed through an intermediary (Tr. 37). At that meeting, Mr. Infanti informed Mr. Gasser that equipment he (Mr. Gasser) suspected was removed from the plant was in fact removed at his and Scharpf's behest. They caused key components of the chair manufacturing business to be removed with the intent that they be returned after the sale so that the chair manufacturing business could be resumed (Tr. 38). The equipment was removed by trucks, Mr. Infanti told him, which were parked in a shipyard adjacent to the plant.

Based upon that information, a motion by the plaintiffs to re-open discovery was granted with permission to conduct an unannounced inspection of the premises accompanied by United Sates Marshals (Tr. 41). That inspection by Mr. Gasser occurred in June 2006, and photographs he took on that occasion were received in evidence as Px 7-1 - 7-40. Mr. Gasser described what the photographs depicted and, in essence, the dies, the molds, the machines and other assets that should have been available for sale at the auction on April 12, 2005 were back in place, manufacturing chairs in the name of a company called EKI (Tr. 43, 125, 127, 262). It is significant to note that EK are the initials of Elizabeth Kavlakian, Vittorio Infanti's former wife (Tr. 285).

The testimony of the persons who played some role in reducing the auction sale ordered by this Court to little more than a charade are the following:

Bobby Blanchard was deposed by the plaintiff and cross-examined at his deposition by counsel for Amboy and Scharpf. His deposition testimony was received in

evidence. He was employed by his uncle Patty Blanchard, the owner of Patty's Flatbed Service. He knew Vittorio Infanti, who was a friend of his uncle, for many years. He testified that at least two weeks prior to the auction sale he, together with Infanti, moved "all the stuff" out of the Corporation's premises. (BB Dep. 11). "I was with my uncle. There was a guy named George Scharpf and Infanti's wife was standing outside when we were moving the stuff." (BB Dep. 12). Three or four box trucks were fully loaded with equipment, were locked and moved around the corner to the adjacent shipyard (BB Dep. 28). As will be noted hereafter, of some significance, is his testimony that one of the trucks that was loaded up was "one of Mr. Infanti's trucks. He had a white truck with the red nose on it. The only truck he has. We loaded that truck. It's a white box with a red old Chevy nose on the front." (BB Dep. 25).

Mohamed Adam testified that he owned the shipyard premises immediately adjacent to the premises of Infanti International (Tr. 128) and that Mr. Infanti had been a good neighbor since 1993. Several weeks prior to the auction, Mr. Adam was asked by a man named Patty (later identified as Patty Blanchard), speaking on behalf of Mr. Infanti, if he could park some trucks on Mr. Adam's property (Tr. 133). Mr. Adam then spoke with Mr. Infanti to confirm that request and granted it when the request was confirmed. Thereafter, several box trucks and a trailer were parked at various points around the shipyard (Tr. 135). Mr. Adam testified that on the day of the auction he saw Mr. Scharpf walking in his parking lot and looking into one of the trucks, the door of which was partially open. Several weeks later, Mr. Infanti was asked by Mr. Adam to remove the trucks (Tr. 142-43) and he did, unloading them at his own premises (Tr. 142-44). Reference was made above to the significance of one of the trucks being Infanti's

and that it was white with a red nose. That seemingly insignificant fact confirms for the Court, the credibility of Mr. Adam and dispels as unpersuasive the foreseeable contention that Scharpf could not have looked into a truck which Bobby Blanchard testified were locked. The Court is driven to that conclusion as follows:

Among the witnesses testifying was Luis Guillermo Soto, who was employed by Vittorio Infanti from 1992 until he was terminated by Elizabeth Kavlakian in January 2005. He testified that he was present when Mr. Infanti bought a white van, title to which was taken in Mr. Soto's name (Tr. 287). The van was used by the Corporation in connection with its business (Tr. 288). Some time thereafter, Elizabeth Kavlakian directed him to sign the van's registration in blank, which he did in January 2005, although the date appearing on the document is July 11, 2005.

On April 3, 2006, Mr. Adam was deposed by Scharpf in the course of which the following colloquy appears:

> Q. I think you indicated that you saw Mr. Scharpf standing near this area on P-3 . . . . ?
>
> A. Yes. He was standing in my parking lot.
>
> Q. And you had mentioned that you saw him opening the truck, is that correct?
>
> A. Yes, he was looking inside the truck.
>
> Q. Can you describe the truck?
>
> A. It's a box truck.
>
> Q. A box truck. Do you know what color it was?
>
> A. It's a white box on the top. I think it was red in the front or something like that. It was orange, something.

(Adam Dep. at 59).

On being deposed by counsel for Amboy, the following colloquy appears:

> Q.     The truck that you saw Mr. Scharpf looking in, you told
>        us you didn't know it was George at first, right?
>
> A.     * * * * I saw him and I know who it is and I talked to
>        him.
>
> Q.     Right.  And you saw him, you saw him look inside the
>        truck?
>
> A.     Right.
>
> Q.     Right.  And you described that as a white truck with a
>        red front?
>
> A.     Right.

(Adam Dep. at 68).

The testimony thus compels the conclusion that the truck Scharpf was reported to be looking into was the Corporation's truck and not Blanchard's, and therefore accessible to Scharpf.

Also deposed was Patrick (Patty) Blanchard, the uncle of Bobby Blanchard.  He testified that he knew Mr. Infanti for many years and considered him a friend (PB Dep. at 10).  He testified that he was present at the auction and met Scharpf there although he had seen him around there prior to the auction (PB Dep. at 13).  Approximately a week or two prior to the auction, Infanti called and requested him to bring some trucks and trailers to the Corporation's premises in which he could "store chairs and stuff."  (PB Dep. at 15).  He then saw them loading chairs, parts of chairs and machines.  His testimony that he did not see Scharpf at the premises while the trucks were being loaded (PB Dep. at 21), was in direct conflict with the testimony of his nephew Bobby although

he then testified as to being uncertain about whether Scharpf was or was not there. (PB Dep. at 22-25). He confirmed the testimony of others, however, that after the trucks were loaded they were then driven to the adjacent shipyard of Mr. Adam where they were stored and returned to the Corporation's premises after the auction. A critical reading of the cold pages of this witness' testimony leaves the Court with the distinct impression that he was considerably less then forthright in his answers, but in all material respects was consistent with the testimony of his nephew, Mr. Adam and Vittorio Infanti, *infra*.

The two remaining and crucial witnesses were Vittorio Infanti and George Scharpf.

Infanti's direct testimony was that perhaps the same day on which the M&O of March 2, 2005 was issued, he and Scharpf met at the Corporation's premises at which time Scharpf told him that he was going to purchase the assets to be sold for $200,000 and that Infanti was to remove all the dies and "unhook the machines;" remove all the molds and make sure that Gasser Chair Manufacturing would not buy anything (Tr. 298-99). Infanti was also told to find the trucks to remove the stuff and he arranged for Patty Blanchard to do that (Tr. 300-01). He told Blanchard what his trucks were needed for and to make provision for storing the trucks in Mr. Adam's adjacent shipyard. All the dies and all the molds were removed from the machines and made ready to be loaded onto the trucks which was done in one day approximately a week or two before the auction sale (Tr. 303). Although he was uncertain about Scharpf's presence when all of this was happening, he had no doubt that Scharpf was aware of it because it was at his direction that the factory was being denuded (Tr. 305). Chairs could not be manufactured with the machinery and equipment removed (Tr. 310). Infanti then

identified photographs depicting all the machines and equipment that was removed from the factory (Tr. 310-333).  His testimony corroborated the testimony of Gene Uhlig regarding molds that were on his premises that were brought by Infanti to be repaired (Tr. 332-330).

When the auction sale was finished, the machines and equipment that had been removed were brought back to the factory (Tr. 310), and Scharpf was present at that time (Tr. 333).

Infanti then related his meeting with Mark Gasser during the industry show at the Javits Center in November 2005, at which he revealed everything that had occurred prior to the auction.  When asked why he decided to disclose everything to Mr. Gasser months after the events, he explained:

> A. Because I find out George Scharpf, he lied to me.  He owned everything.  I didn't own anything.  He owned everything.  He spent the money.  My three credit cards, he spent all of the money we had.  So Infanti was in debt, that's what happened.  So that's what happened.  I find out that George Scharpf, he owns everything.  I don't own anything.  He told all of the employees, Mr. Infanti owns nothing, I own everything.

The cross-examination of Infanti by counsel for Amboy was aimed at impeaching his credibility by inquiring at some length about matters having only tangential if any, relevance to the issues of this proceeding.  No questions were asked concerning the details of the events designed to frustrate the legitimacy of the auction sale.  This Court has had more than a passing familiarity with testimony by Infanti and in <u>Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.</u>, 943 F. Supp. 201 (E.D.N.Y. 1996), took a very dim view of his credibility.  His testimony in this proceeding suffered from no such deficiency.

He was as responsive to questions both on direct examination and cross as his language limitations allowed. His account of events and the roles played by the relevant actors was consistent with the accounts given by each of them.

George Scharpf, the President, Chairman of the Board and Chief Executive Officer of Amboy National Bank, and a defendant in this action, testified on his own behalf. He identified the two buildings occupied by Infanti International and depicted on Px 10, and testified that they were owned by Amboy. He stated that he purchased them from Amboy, one in 2005 and the other at a later date, both prior to the auction sale on April 12, 2005. The purchase price for one was $800,000, for the other $1.5 million with the proviso that if they were sold within two years, the bank would get an additional $200,000. The buildings were sold within two years for approximately $4 million and the bank was paid the additional $200,000.[2]

Between January and April 2005, a company called EKI was owned by the Scharpf Corporation which, in turn, was entirely owned by Scharpf. Prior to being owned by the Corporation, EKI was owned entirely by him (Tr. 440). That information was given by direct answers to direct questions which was not to be frequently replicated thereafter. The Court will assume the risk of what may be regarded as an unwarranted protraction of this opinion by setting out portions of Scharpf's testimony notable for its evasiveness.

> Q.  Now, isn't it a fact that EKI was formed for the specific purpose of acquiring the assets of Infanti International?

---

[2]The Court expresses no opinion whether the $1.5 million retained by Scharpf may properly be claimed by the bank by virtue of the fiduciary relationship between them.

> A. EKI was formed in 2002.  One of its purposes at that time was, that if the Infanti loans went down, that we had, that I have a vehicle to try to recover and make good for the bank, as well as recover the loans that I had.
>
> Q. So, in answer to my question, would that be: Yes, it was formed for the purpose of acquiring the assets of Infanti International?
>
> A. I believe I answered it, but its yes to the extent that what came up – that's what came up.

(Tr. 440-41).

> Q. Okay.  Now there was a time when the receiver stopped operating at the Infanti International premises, correct?
>
> A. I don't believe so.  I believe the receiver . . . as a matter of fact, to the best of my knowledge, the receiver never was discharged, that I know of, or anything like that.
>
> Q. No.  No, I'm not talking about discharged, sir.  I'm talking about the manufacture of chairs.
> The receiver operated the business of Infanti, International, is that correct?
>
> A. He was appointed by the judge to be in charge as a receiver.  I'm not sure the full scope of his responsibilities.
>
> Q. Okay.
>
> A. . . . as receiver.
>
> Q. But as receiver, he . . . and that was Mr. Gropper, right?
>
> *   *   *
>
> A. Sandy Gropper was appointed.
>
> Q. And he operated the chair business of Infanti, International?

> A. To the extent that a receiver operates a business, if that's the legal thing, then I assume so, yes. But I don't know.
>
> Q. Okay.
>
> A. But I don't know the real requirements of a receiver.

(Tr. 441-42).

It beggars belief that the President and Chief Executive of a bank for 26 years and Chairman of the Board for 10 (Tr. 436-37) should have no understanding of the function of a receiver.

The litigious history of this case is substantial and many reported opinions relate the tenacious effort of the plaintiffs to satisfy a judgment they obtained against the defendants and their successors in excess of $15 million: <u>See</u> <u>Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.</u>, 943 F. Supp. 201 (E.D.N.Y. 2006); <u>Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.</u>, 1991 WL 180619 (E.D.N.Y. 1991); <u>Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.</u>, 1997 WL 37034 (E.D.N.Y. 1997); <u>Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.</u>, 2006 WL 616267 (E.D.N.Y. 2006); <u>Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.</u>, 1991 WL 10931 (E.D.N.Y. 1991); <u>Gasser Chair Co., Inc. v. Infanti International, Inc.</u>, 358 F. Supp.2d 176 (E.D.N.Y. 2005); <u>Gasser Chair Co., Inc. v. Infanti International, Inc.</u>, 353 F. Supp.2d 508 (E.D.N.Y. 2005); <u>Gasser Chair Co., Inc. v.Infanti International, Inc.</u>, 2004 WL 906487 (E.D.N.Y. 2004); <u>Gasser Chair Co., Inc. v.Infanti International, Inc.</u>, 2004 WL 1243114 (E.D.N.Y. 2004).

On January 8, 2004, this Court preliminary enjoined Infanti International and Vittorio Infanti and others from transferring or encumbering a variety of assets and also appointed a temporary Receiver in whom it vested significant powers over the

Corporation. On February 2, 2004, the defendants obtained an order directing the plaintiffs to show cause why that Order should not be vacated. Scharpf submitted an affidavit in support of the Order to Show Cause dated February 25, 2004. His affidavit plainly reveals a familiarity with the Receivership Order and its terms. In the Court's Opinion reported in 2004 WL 906487 (E.D.N.Y. 2004), Amboy and Scharpf were found to be in contempt of the Order of January 8, 2004. A prerequisite to that finding was that each had notice of that Order and that prerequisite was satisfied.

His testimony throughout was replete with falsehoods, inconsistencies and evasiveness. Illustrative of that harsh assessment of his testimony are the following:

> Q. So, is it your testimony that up to March 2nd, 2005, Infanti International continued to operate?
>
> A. I don't know. I wasn't, to the best of my knowledge, I wasn't there, involved prior to March 2nd.
>
> Q. Well, let me ask you a question. Didn't EKI do business out of 3075 Richmond Terrace prior to March 2nd?
>
> A. No.

(Tr. 442-43).

An affidavit of Gary Gropper dated May 5, 2005, together with the overwhelming other evidence in this regard, stamps this testimony with an indelible mark of falsity. That affidavit was received in evidence as Dx E and in relevant part of paragraph 3 reads as follows:

> Virtually from the date the Receiver surrendered the Company's exclusive occupancy and constructively delivered shared possession to Amboy, Amboy permitted its president, George Scharpf ("Scharpf") and an entity controlled by him and known to the Receiver as "EKI" to have unfettered access

> to the premises * * * [I]t was my observation based upon my
> frequent visits to the premises during this period of time that
> Mr. Scharpf and EKI in conjunction with Mr. and Mrs. Infanti
> immediately began conducting a new business on the
> premises under the EKI name.  Specifically, EKI
> manufactured and sold chairs and stools, similar to the
> business previously engaged in by the Company.

A letter attached to that affidavit dated April 7, 2005, from Stan L. Goldberg,

Receiver, counsel, to Scharpf, confirms that observation.

Received in evidence at that point were plaintiff's exhibits 26 and 27 which are the

interrogatories (26) addressed to Scharpf and his answers to them (27).  Interrogatory

numbered 2 asked for the identification of all purchases of materials and supplies

purchased by EKI for the manufacture of chairs since EKI was formed through April 12,

2005.  Scharpf, as the sole owner of EKI certified under penalty of perjury that he read

the responses to plaintiffs' interrogatories and that the substantive responses are true to

the best of his knowledge (Px. 27 at 8).

His response to interrogatory number 2 was a list of items purchased beginning

on February 11, 2004, and continuing through March 24, 2005 (Px. 27 at 3, 4).  When

confronted with that exhibit, Scharpf's response was, "I don't believe that's true"  (Tr.

446).

When asked by the Court:

When you certified that you purchased fabric and vinyl in 2004 that was not true?

> A.    The Witness: I did not believe that certification said I
>       purchased it in 2004.  I believe that was a certification,
>       here is a list of exactly what we can find in our records.

                              *    *    *

By Mr. Spizz:

> Q.    When did you find out that your answers to the interrogatories was inaccurate?
>
> A.    I don't believe the answers are inaccurate.

(Tr. 448-49).

> Q.    Now, sir, do you recall, you said you never operated out of Infanti International premises a chair business prior to the auction?
>
> A.    To the best of my knowledge, there was nothing done, in that place that represented EKI other than we want to keep option — I wanted to keep my options open once the judge ordered the sale of all of assets.
>
> The Court: What does that mean? Were chairs manufactured prior to the sale?

(Tr. 450-51).

What follows by way of response is a masterpiece of evasion which left that simple question still unanswered.

Scharpf was then confronted with his affidavit dated May 5, 2005 (Px. 28), in opposition to plaintiff's Order to Show Cause why the auction sale of April 12, 2005 should not be set aside. Paragraph 6 of that affidavit reads as follows:

> As I set forth in my April 8, 2005 letter to Mr. Goldberg, the Receiver's attorney (copied to all parties and the Court), I understood that the Receiver was aware that EKI was conducting business at the premises . . . .

and was then asked:

> Q.    Okay. So EKI did have a startup business that was operating out of the premises?
>
> A.    I do not look at that as a startup business. EKI was formed in 2002. It had a number of other transactions, I believe, but nothing of any consequence until that time.

18

Q.     Well.

A.     So, to the extent that this is a startup business; it is to the extent that I now was paying out some people; okay, to maintain the place, yes.

Q.     Well, do you stand behind your affidavit as to paragraph six; that you had a startup business that was operating?  Or that this affidavit, at least to that extent, is incorrect?

A.     The term startup business is the term that I certified to and I'll stand by it.

Q.     Okay.  So, you did have a startup business that was operating.  You do put in the affidavit operating; right?

A.     I did not put in the affidavit — I would like to know what you mean. First, define operating to me.

Q.     Sir, it's not my affidavit.  It's yours.

A.     All right.  Would you please show me where it said operating.

Q.     I'm sorry.  Conducting.  I am sorry.  You're absolutely right. Conducting a startup.
       What did you mean by conducting a startup?  That's the question, sir.

A.     I'm thinking about --

Q.     That's fine?

A.     — whether conducting a startup business is . . .
       To the extent, okay, I was now trying to figure out and gear up as to what I was going to do in the next month-and-a-half, I did not contact any suppliers or anybody else because I didn't know where it's going.
              So, to the extent I wanted to be prepared, okay, to make sure that whatever decision I made — which nobody knew what decision I was

going to make because I purposely would not
tell anybody, including anybody there, Gropper,
et cetera – I wanted all my options available to
me.

Q.      Did you tell Mr. --

A.      So. conducting is the word I used to allow people that
were paid to stay there to protect the property.

The balance of the direct examination of Scharpf is as replete with similarly

egregious falsehoods and evasions which are multiplied by his responses upon re-direct

examination.

As regards the crux of this proceeding, namely, Scharpf's alleged active

participation in removing machinery and supplies from the premises of Infanti

International prior to the auction sale with the result that the Court's Order of March 2,

2005 was undermined and obstructed, his testimony, elicited by his counsel, was simply

this:

Q.      Do you have any personal knowledge of trucks being
loaded or items, assets, removed from Infanti
International?

A.      No. Absolutely not.

Q.      Did you direct anyone to receive assets from Infanti
International?

A.      Absolutely not.

(Tr. 477).

A conscientious evaluation of the testimony of Mark Gasser, Vittorio Infanti,

Bobby Blanchard, Mohammed Adam, Gene Uhlig and Salvatore Olivo, and careful

attention having been paid to the demeanor of each of them as witnesses, their direct,

responsive answers to questions put to them drives the Court to conclude that each was a credible witness who established beyond any doubt that Scharpf knowingly and intentionally subverted the integrity of an auction sale of the assets of Infanti International ordered by this Court, and in so doing evinced a contempt for the authority of this Court and its lawful mandate. His testimony lent credence to the observation of Wigmore that "it can hardly be denied that the moral efficacy of the oath has long ceased to be what it once was." 6 Chadbourne, <u>Wigmore on Evidence</u> § 1827 (Rev. Ed. 1976). It may no longer be believed that the divine hand will smite the liar and all too often, even the fear of being indicted for perjury having taken the oath does not inhibit false testimony.

<u>Amboy Bank</u>

The Court's Order of March 2, 2005, explicitly declared that Amboy shall be deemed a bailee of the assets of Infanti International charged with all the obligations that status implies. Amboy delegated its responsibilities as bailee to Scharpf. In the course of the direct examination of Scharpf he was asked:

> Q.   . . . And isn't it a fact that Amboy in connection with carrying out its duties as bailee, delegated those responsibilities to you, Mr. Scharpf?
>
> A.   Yes.
>
> Q.   So you were the only one on behalf of Amboy National Bank who was responsible for carrying out the judge's instructions or the responsibilities that were placed on you by the Court in the March 2nd order; is that correct, sir?
>
> A.   To the extent that I was the one physically taking and going over there, yes.

It would be an affectation of research to cite extensive authority for the proposition that a principal is responsible for the conduct of his agent. The citation of two cases should suffice. In <u>United States v. Twentieth Century Fox Film Corporation</u>, 882 F.2d 656 (2d Cir. 1989), the corporation was prosecuted for criminal contempt and convicted when its employee, acting within the scope of his authority, failed to comply with the law and a consent decree. The corporation here, Amboy, although sought to be held in civil contempt, given the compelling evidence adduced at this hearing, might justifiably have been prosecuted for criminal contempt. Scharpf, the President, Chief Executive Officer and Chairman of the Board of Amboy, was not merely an agent, he was, in his persona, the embodiment of the bank. In <u>United States v. The Incorporated Village of Island Park</u>, 888 F. Supp. 419, 437-39 (E.D.N.Y. 1995), the Village was held liable under the False Claims Act based upon the action of its agent. The Court there wrote that:

> An agent's acts are within the scope of his actual authority if it is the kind of work he is employed to perform, occurs within the authorized limits of time and space and is actuated, at least in part, by a purpose to serve the master. Apparent authority is the authority which outsiders would normally assume the agent to have, judging from his position within the corporation and the circumstances of his conduct. (internal citations omitted).

It would similarly be an affectation of research to cite authority for the proposition that a bailee who exercises unlawful dominion and control by himself or through his agent over the property placed in his care and for the safety of which he assumes responsibility is liable for the ensuing harm.

When the Court appointed a Receiver over the property of Infanti International,

that property was, as of that time, under the supervision and control of the Court.  <u>See</u> <u>Wabash R.Co. v. Adelbert Coll.</u>, 208 U.S. 38, 54 (1908); <u>2 Clark on Receivers</u>, § 375 at 628.  When Scharpf caused the assets of Infanti International to be removed from its premises and excluded from the auction sale, he not only subverted the Order of this Court, but having exercised unlawful dominion and control of the property, as a matter of law, converted it.  His testimony also makes clear that he was, at all times, acting in the interest of Amboy.  For example:

> Q. Now, isn't it a fact that EKI was formed for the specific purpose of acquiring the assets of Infanti International?
>
> A. EKI was formed in 2002.  One of its purposes at that time was, that if the Infanti loans went down, that we had, that I have a vehicle to try to recover and made good for the bank, as well as recover the loans that I made.

(Tr. 440-41).

> . . . I authorized Elizabeth to keep some people there because I didn't want anything to disappear or anything to happen as long as the bank was bailee . . . .

(Tr. 451)

> A. Nobody.  There was nobody in that place because I wasn't sure what my plans were.  It depended all on the auction as to whether I could recover the money that the bank lent to the Receiver.

(Tr. 454)

> Q. So, would it be fair to say that when you were over there at 3075 Richmond Terrace between March 2nd and April 12th you were wearing two hats.  One as

> representing the bank as bailee and two, on your own
> behalf?  In EKI?
>
> A.   I would not characterize it in that way.
>
> Q.   How would you characterize it?
>
> A.   My responsibility is to the bank.  Primary.  Always.  For
> 37 years.

(Tr. 458).

> On cross-examination by Amboy:
>
> Q.   Mr. Scharpf, you indicated . . . that you were the only
> person from the bank who visited the Infanti site.  Is
> that correct?
>
> *   *   *
>
> Q.   I'm talking about March 2 through April 12, 2005?
>
> A.   Yes.
>
> Q.   To the extent the bank has any eyes there you're it?
>
> A.   Yes.

(Tr. 486-87).

Amboy, as principal, is plainly liable for the conduct of Scharpf, its President,

Chief Executive and Chairman of the Board.

Although not named as a party in this motion, the testimony presented at this

hearing drives the Court to conclude that the Receiver, an officer of this Court, flagrantly

breached his duty to preserve and protect the property he was appointed to administer.

As has been noted, Sanders Gropper was appointed temporary receiver of Infanti

International, Inc. by Order of this Court dated January 8, 2004.  That Order provided

that before entering upon his duties, he shall execute an oath that he will faithfully and

fairly discharge the trust committed to him. It authorized him, among other things, to immediately take charge and control of the business and property of Infanti International, Inc., with full and absolute authority to operate Infanti International in the ordinary course of business.

By an Order dated March 2, 2005, the Receiver was directed to conduct a "public auction sale of the assets, tangible and intangible, of Infanti International, <u>excluding the patent</u>, but including all equipment, material and furniture, and including used and partially completed chairs." (emphasis added). The Order directed that the notice of sale shall advise that certain chairs are claimed to violate the trade dress of Gasser chairs and infringe on Gasser patents and an announcement to that effect shall be made at the sale.

As regards the patent, it is important to note that in a Memorandum and Order reported in 353 F. Supp.2d 342 (E.D.N.Y. 2005), this Court held that a patent numbered 6,135,562 for a "Versi-Chair," once owned by Vittorio Infanti, which he subsequently conveyed to his daughter, was vacated as a fraudulent conveyance and declared to belong to Gasser Chair Company. In a Memorandum and Order reported in 2006 WL 297451 (E.D.N.Y. 2006), the Court held that Scharpf never received a security interest in the patent and on February 15, 2006, pursuant to NYCPLR § 5228, the Court appointed James Quinton, Esq. Receiver of the patent, to sell it at a public auction at which Gasser, as judgment creditor may become purchaser and permitted to credit bid to the full amount of their judgment.

Sanders Gropper ("Sanders"), was called as a witness by Amboy. His testimony, in virtually every respect was startling for its vagueness, or inaccuracy or falseness. The day to day responsibilities as a Receiver were delegated by him to his son, Gary Gropper

("Gary"), who he testified was on the premises of Infanti International almost every day (Tr. 378). At another point, he testified that Gary was there three or four times per week (Tr. 394). Gary Gropper, who was also called as a witness by Amboy, on cross-examination acknowledged that he was present on the premises on only 8 days out of a total of 42! (Tr. 541).

Sanders entered into a series of loan transactions with Amboy totaling $135,000, and when asked on direct examination whether the signature on the notes evidencing those loans were his, replied that he wasn't sure (Tr. 381-86).

Disturbing, was his testimony that he learned for the first time, at this hearing, that four to six truckloads of equipment plus one huge trailer loaded with equipment were removed from the premises of Infanti International within weeks before the auction sale (Tr. 408). And yet, he went to the premises on March 28th in response to notice from Gasser's counsel that equipment was being removed and testified:

> We looked to see what equipment was there that we were aware of, what was missing. Remember, you go to a facility even with a lot of equipment, six truckloads of equipment were pulled out, you are going to see it. <u>You have to be blind to miss it</u>. (emphasis mine).

(Tr. at 411).

Most troubling, however, was his testimony that the Versi molds were not part of the auction because I ordered that they be excluded. His conclusion to that effect was my Order of March 2, 2005, directing the auction sale, the relevant part of which was set out above and makes no mention of molds or of "Versi." What was excluded from the sale was the <u>patent</u> (Tr. 418). His obvious failure to understand the intangible property interest that is a patent and the tangible property - the molds - made pursuant to a

patent, caused to be excluded from the auction sale valuable assets of the company. His failure to inquire as to what the Order excluding the patent meant, and in deciding what it meant on his own, erroneously, was plainly negligent. His testimony that the molds were present at the premises on the day of the auction and that "people were falling all over them" (Tr. 422), is flatly contrary to the testimony of Gene Uhlig, who makes molds and didn't see any, and to the testimony of the auctioneer.

Gary Gropper's testimony on direct examination by Amboy that he was on the premises of Infanti International "virtually every day, five days a week," was patently false as cross-examination revealed. When notified by counsel for Gasser that he was informed that equipment was being removed from the premises, his investigation two days later, consisted of asking the Infantis (Vittorio and his wife Elizabeth) and other workers who were around, who, it should be noted, would at that time have been in the employ of EKI, i.e., Scharpf, whether they knew of "anything happening, moving things out over the weekend, and they said no." He then advised Sanford that he had no evidence of anything being moved (Tr. at 528). That "investigation" was akin to inquiring of the fox if he knew of anything amiss at the hen house.

Given the persuasive and uncontradicted evidence that four to six trucks and a large trailer loaded with equipment were moved from the premises and the Receiver's opinion that "one would have to be blind to miss it," would lead to the conclusion that the Receiver's "investigation" consisted of nothing more than a "wink and a nod."

Gary's testimony was difficult to reconcile in some significant respects. He testified that the Receiver stopped operating the Company at the end of January, beginning of February (Tr. 542-43), and that Scharpf was "running a chair business out

27

of the premises" after that (Tr. 541). That testimony is contradicted, however, two pages later when this colloquy took place:

> Q. Okay.
> So it was the end of January, beginning of February when Infanti International stopped . . . the receiver made a decision for whatever the reason to shut down, correct?
>
> A. Yes.
>
> Q. Okay.
> Isn't that when Mr. Scharpf started his chair operating business?
>
> A. To my recollection, no.
>
> Q. So what happened between February and March, was anything going on in the premises then?
>
> A. I was trying to get ready for the auctioneer to come in. There were a few people---
>
> Q. Wait a minute. Hold on.
> There was no mention of an auctioneer until March 2nd right?
>
> A. So * * * question again, please?
>
> Q. So what I'm saying is, you weren't getting ready for the auctioneer before March 2nd.
> After January, beginning of February, when you closed down the operation, do you know what was going on at Infanti International's premises during that period of time?
>
> A. Whenever I was there, it was nothing.
>
> Q. Nothing?
> Weren't there employees there?
>
> A. There was some people there. They were just cleaning, straightening up, maybe three employees, if I remember correctly.

Q. Who was paying them.

A. I don't know and I didn't care.

Q. So you are the receiver over these premises. You got people working there, doing things, getting paid. You don't know what they were doing there and you didn't care, is that your testimony?

A. No.

\* \* \*

(Tr. at 543-544).

Given the facts as found by the Court, the conclusion of law is inescapable, namely, that Scharpf has knowingly and intentionally been contemptuous of the Order of this Court dated March 2, 2005; has knowingly and intentionally obstructed and frustrated the effectuation of that Order and that he and Amboy, as his principal are jointly and severally liable for the consequences of his actions.

The parties are hereby directed to appear before this Court at 10 a.m. on June 26, 2008. At that time a hearing will be held for the purpose of determining the monetary and such other relief to which the plaintiffs may be entitled in light of the finding of fact and conclusions of law reflected above. Two weeks prior to the hearing, the parties are also directed to file, simultaneously, memoranda of law addressing the scope of relief which the Court may properly grant.

Extensive findings have been made regarding the discharge of the Receiver's duties which fell significantly short of the fiduciary standard of responsibility he owed to the Court and to the parties affected by the receivership property. See Phelan v. Middle States Oil Corp., 154 F.2d 978, 991 (2d Cir. 1946). The Receiver not having been named

as a party in this motion, a finding of liability as to him would be inappropriate.  The Receiver and the plaintiffs are directed to appear at 2 p.m. on June 26, 2008, at which time consideration will be given to the implications of those findings for the remedies which may be invoked by the Court.

SO ORDERED.

Dated:          Brooklyn, New York
                June 2, 2008


_____S/_____

I. Leo Glasser