UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------x

GEORGE GASSER and GASSER CHAIR
COMPANY, INC.,

                                    Plaintiffs,

        -against-

INFANTI INTERNATIONAL, INC., MARK          <u>MEMORANDUM AND ORDER</u>
INFANTI, NANCY APONTE INFANTI,                  03 CV 6413 (ILG)
VITTORIA INFANTI, MARGUERITA
INFANTI, MARIELLA INFANTI, AMBOY
NATIONAL BANK, GEORGE E. SCHARPF
and SANDERS W. GROPPER, in his
capacity as Receiver of Infanti
International, Inc.,

                                    Defendants.

------------------------------------------------x

GLASSER, United States Senior District Judge:

## <u>INTRODUCTION</u>

        Nearly twenty years ago, Plaintiffs Gasser Chair Company, Inc. and George

Gasser (collectively, "Gasser" or "Plaintiffs") commenced an action against Infanti Chair

Manufacturing Corporation ("Infanti Chair") and Vittorio Infanti ("Infanti") individually

for the infringement of one of Gasser's patents.  On August 9, 1996, Plaintiffs obtained a

judgment in excess of $15 million (the "Judgment") against Infanti and Infanti Chair.

The current action, brought by Gasser against now defunct Infanti International, Inc.

("Infanti International"), seeks, *inter alia*, to set aside a series of fraudulent conveyances

and impose liability for the Judgment, which remains unpaid, on Infanti International

as successor in interest to Infanti Chair.  The Amended Complaint also asserts that

Gasser has a first priority lien on the property of Infanti International superior to liens

held by defendants Amboy National Bank ("Amboy" or "the Bank") and George Scharpf ("Scharpf"). Both Amboy and Scharpf filed cross-claims against Infanti International to recover monies they advanced to it, and counterclaimed against Gasser to assert that, based on the collateral conveyed to secure these loans, they hold superior rights to the property of Infanti International.

### A.   Plaintiffs' Motion for Default Judgment

On March 30, 2005, Infanti International's counsel, Katten, Muchin, Zavis & Rosenman, requested permission to withdraw because Infanti International had not paid its legal bills. On April 5, 2005, the Court granted that motion and warned Infanti International that because "a corporation cannot appear pro se," counsel must appear on behalf of the company within twenty days of the Order or "judgment(s) which may be obtained in any subsequent proceedings may be entered against it by default." No subsequent appearance on behalf of Infanti International has ever been made in this action. On May 19, 2005, Plaintiffs moved this Court to enter default judgment on the first through seventh causes of action in their Amended Complaint, including a declaration that Infanti International is a successor in interest to Infanti Chair, and therefore liable for Gasser's Judgment.[1]

---

[1] Counts one and two request that this Court declare that Infanti International is the successor in interest to, and the mere continuation of, Infanti Chair, and as such, liable for the Judgment. Counts three through six allege that Infanti International committed fraud against Plaintiffs, aided and abetted the fraud that Infanti perpetrated against Plaintiffs, conspired with Infanti to perpetrate the fraud, failed to comply with a restraining notice, and failed to comply with an income execution.

**B.      Amboy's Motions for Partial Summary Judgement and Default Judgment**

Amboy, a creditor of Infanti International, has two motions pending before the Court:  (1) a motion for partial summary judgment; and (2) a motion for default judgment against Infanti International.

Amboy's motion for partial summary judgment seeks a declaration from the Court that (1) Infanti International is indebted to it for the amount of several loans it made to the company, and (2) Amboy holds a first priority perfected lien on the collateral of Infanti International that is superior to Plaintiffs' Judgment, and as a result, it is entitled to the proceeds of a sale of the assets of Infanti International that was held on April 12, 2005.  However, Amboy also filed a motion, ostensibly pursuant to Federal Rule of Civil Procedure 41, seeking an order of this Court that would dismiss all of Gasser's claims against it.  In its submission in support of its motion, Amboy acknowledges that Gasser's interest in the proceeds of the auction is superior to its own. That acknowledgment makes moot Amboy's motion for partial summary judgment as to its claim of priority over the proceeds of the auction, thus the motion as to (2) above is hereby denied.[2]  Accordingly, the Court *sua sponte* grants summary judgment in favor of Plaintiffs on their claim that they have priority over Amboy to the proceeds of the sale held on April 12, 2005.

Amboy's motion for default judgment against Infanti International, based on Infanti International's failure to appoint replacement counsel, seeks judgment on its

---

[2]  The relief it sought by its motion to dismiss has since been denied for reasons fully discussed in a Memorandum and Order dated June 10, 2008.

cross-claim against Infanti International – that it is indebted to Amboy for the amount of the loans plus interest, the same relief sought in (1) above for partial summary judgment.

### C. Scharpf's Motions for Partial Summary Judgment and Default Judgment

Scharpf, President of Amboy, and a creditor of Infanti International, acting in his individual capacity, also filed a motion for partial summary judgment seeking essentially the same relief as Amboy – that he is entitled to declarations that Infanti International is indebted to him for several loans he personally made to the company and that his lien on the collateral of Infanti International is superior to all creditors, except Amboy. Scharpf also moved for default judgment against Infanti International on his cross-claim that it is indebted to him for the amount of the loans he personally made to it.

In response, Plaintiffs argue that Scharpf was not a lender, but rather an investor in the company, and that his claims should therefore be equitably subordinated to Plaintiffs' claims. In the alternative, they contend that even if Scharpf was a lender, that the loans were nonetheless invalid because the security interests in support of those loans were conveyed with an intent to hinder, delay, or defraud Infanti International's creditors and were therefore fraudulent conveyances pursuant to New York Debtor & Creditor Law ("DCL") § 276, and even if there was no requisite intent, the conveyances were constructively fraudulent pursuant to DCL §§ 272-75.[3]

---

[3] Defendants also move the Court to strike the Affidavit of Plaintiffs' counsel Alex Spizz in opposition to the summary judgment motions (the "Spizz Affidavit").

## BACKGROUND

### A.    Bankruptcy of Infanti Chair and Infanti

Within a month of this Court's August 9, 1996 Judgment, Infanti Chair filed for

bankruptcy pursuant to Chapter 11 in the United States Bankruptcy Court for the

Eastern District of New York.  Am. Compl. ¶ 26.  Infanti, in his individual capacity, also

filed for bankruptcy pursuant to Chapter 11 in the United States Bankruptcy Court for

the District of New Jersey.  Id. ¶ 23.  Both courts found the Judgment to be non-

dischargeable.  Id. ¶¶ 25, 33.

Two years later, the Bankruptcy Court for the Eastern District of New York issued

an order authorizing the sale of Infanti Chair's assets.  By August 1998, the Trustee

appointed by the Bankruptcy Court had shut down Infanti Chair's operations and sold

all its assets.  Id. ¶ 30.

### B.    Amboy, Scharpf, and the Creation of Infanti International

Amboy is a federally chartered commercial bank with locations throughout New

Jersey.  See Affidavit of Alex Spizz ("Spizz Aff."), dated November 23, 2005, Ex. 1 at 8:7-

11.  It is privately owned by approximately seventy shareholders.  Id. at 8:23-9:4.

Scharpf is the President of Amboy, Chairman of its Board of Directors, and owns a 16%

stake in the Bank.  Id. at 8:16, 9:7-12, 129:7-18.

At the time Infanti Chair filed for bankruptcy, it had borrowed from and owed

Amboy approximately one million dollars.  Id. at 13:17-14:12.  Amboy has never been

repaid for any of those loans, but following the bankruptcy, it foreclosed on a mortgage

that Infanti Chair had given it on the two factory buildings which Infanti Chair owned,

and thereby acquired ownership of that property through its wholly owned subsidiary

MES Realty, Inc.  Id. at 14:22-16:4; Amboy's Cross-Claim ¶ 18.

Following the bankruptcy proceedings, Infanti approached Scharpf, who at that time had been a business friend of his for nearly twenty years, seeking help in restarting his chair manufacturing business.  Id. at 22:13-17, Ex. 6 at 9:20-10:14.  During the relevant time period, Scharpf had the authority to make loans on behalf of Amboy.  Id., Ex. 1 at 33:3-5.  Scharpf testified that he told Infanti that he should "find other people to help invest in the business with him rather than the [B]ank."  Id. at 23:25-24:3.  Shortly after this initial meeting, Scharpf again met with Infanti to discuss the prospect of Amboy helping Infanti restart the business.  Aware of the Judgment obtained by Gasser, Scharpf advised Infanti that Amboy would only consider loaning him money if Infanti formed a new corporation owned and financed by his children.  Id. at 30:24-32:11, 65:8-11.[4, 5]

Shortly thereafter, on February 9, 1999, just two months prior to the

---

[4]  The 2002 deposition testimony of Scharpf shows that he was fully aware of the implications of the Judgment on a new company if it were owned by Infanti directly.

> Q:  Now, you said the corporation would have to be owned by his children.  Why is that?
> A:  Because he had a judgment from Gasser that had to do with a personal judgment that was not extinguishable by his bankruptcy.
> Q:  That's the judgment by Gasser Chair Company and George Gasser, is that right?
> A:  Yes.

Id. at 31:20-32:6.

[5]  At his 2005 deposition, Scharpf's testimony on this point was in direct contradiction to his 2002 deposition testimony.  In 2005, Scharpf testified that he never gave any advice regarding the formation of the company, and that he was unaware that the Judgment had not been discharged.  Id., Ex. 6 at 6:25-7:13.  However, in 2002, Scharpf testified that he suggested the form of incorporation.

> Q:     This was a new corporation that was specifically formed at your suggestion, correct?
> A:     Absolutely.

Id., Ex. 1 at 65:8-10.

confirmation of Infanti Chair's Chapter 11 plan, articles of incorporation were filed on behalf of Infanti International. Id., Ex. 2. Infanti testified that he divided the shares of that company amongst his children, who are also named as defendants here, but that he never issued the certificates of shares to them. Affidavit of Mark Gasser ("Gasser Aff."), dated October 24, 2004, Ex. F at 48:21-52:9.

### C. Operations of Infanti International

Infanti International, as did Infanti Chair, manufactured chairs for casinos, hotels, and restaurants. See id. at 32:18-25. Amboy permitted Infanti International to use the former Infanti Chair factory to manufacture its chairs. Id. at 33:6-9, 21:2-6. Although Infanti International had a month to month lease, it never paid any rent to Amboy for the use of its property. Id. at 21:7-22:12. The factory is currently occupied by EKI, LLC ("EKI"), a chair manufacturing company owned by Scharpf, who successfully purchased the assets of Infanti International sold at an auction on April 12, 2005, described below in more detail. Id. at 25:18-25. EKI also does not pay any rent to Amboy for its possession and use of the property. Id. at 25:15-25.

### D. The Bank Loans

On April 8, 1999, Amboy extended a line of revolving credit up to $100,000 to Infanti International, and on July 14, 1999, increased that line of credit to $200,000. Spizz Aff., Ex. 13. In consideration thereof, Infanti International granted Amboy a security interest in its accounts receivable, notes, bills, general intangibles, contract rights, inventory, and equipment. Id., Ex. 4. Infanti International continually overdrew on the revolving credit account. As the overdrawn checks were presented to Amboy for payment, either Scharpf or Domenick Margiotta, the loan officer in charge of the Infanti

International account, would review the checks and advance unsecured funds to pay them.  Id., Ex. 5 at 48:14-49:7, 51:14-21, Ex. 6 at 65:9-13.  Margiotta testified that Scharpf conferred with Infanti regarding the purpose of the checks, and ordered Margiotta to pay them all.

By September, 1999, Infanti needed additional funds and again turned to Scharpf.  On September 10, 1999, Scharpf, who had the power to approve loan increases, approved an increase of Infanti International's revolving line of credit from $200,000 to $300,000.  Id., Ex. 1 at 84: 20-85:4, Ex. 13.  The purpose of the increase was to cancel the overdraft that had accumulated.  Id., Ex. 8 at 36:14-22, Ex. 5 at 41:25-42:6.  The consolidation of these lines of credit secured these formerly unsecured advances and made it appear on the books that Amboy's first $200,000 loan had been paid in full.  Id., Ex. 1 at 87:3-88:3, Ex. 5 at 41:25-42:6, Ex. 6 at 64:5-66:25.  On February 14, 2000, the loan went into non-accrual, meaning that Amboy was not charging any interest on it.  Id., Ex. 6 at 15:14-19, Ex. 5 at 56:21-57:8, 77:11-78:18.

On April 18, 2000, Amboy extended additional monies to Infanti International by consolidating the two prior loans with a second revolving credit note, totaling $500,000, secured again with the same collateral.  Id., Ex. 13, Ex. 4.  The Chief Financial Officer of Amboy, Stanley Koreyva, continued to review all checks written by the company to determine which would be honored.  Id., Ex. 8 at 55:5-57:25, 37:15-38:13.  On December 24, 2003, one day after Gasser commenced this action, Infanti International executed a third promissory note for a $390,360.53 loan from Amboy, which was also secured by the same collateral and covered previous unsecured overdraft loans.  Id., Ex. 8 at 35:12-16, Ex. 13.  All of the promissory notes were ostensibly

bolstered by the personal guarantees of Infanti despite the fact that Scharpf knew that Infanti was an adjudicated bankrupt, that he did not have any assets, and the likelihood of being reimbursed by him based on Infanti's guarantees was "slim." Id., Ex. 1 at 56:24-57:21.

Over the course of Infanti's relationship with Amboy, he repeatedly approached Scharpf when he needed additional funding, and Scharpf decided whether or not Amboy would extend the additional funds. Id., Ex. 5 at 83:4-84:10. Scharpf's decisions to continually increase the loan amounts did not need to be ratified by the loan committee at Amboy Bank, of which Scharpf was a member, because Scharpf had authorization to issue loans up to $10 million. Id., Ex. 12 at 13:3-14:23, 22:25-23:3, Ex. 6 at 89:16-20. Despite testimony that the Infanti International loans were discussed at Amboy Board meetings, the Board minutes, which were recorded by Scharpf, do not reflect any such discussions. Id., Ex. 6 at 28:22-30:9, 48:7-15. At no point during the life of the loans did the Bank ever request or receive any financial statements or tax returns from Infanti International. Id. at 39:17-20, Ex. 5 at 11:13-21, 53:8-24. Scharpf testified that the loans were an exception to Amboy's loan policies, and the purpose of the loans was to preserve Amboy's interest in the two factory buildings by having Infanti International serve as a tenant to maintain and improve the premises. Id., Ex. 1 at 39:21-40:4, Ex. 6 at 90:9-14. Scharpf also admitted that the only way the Bank would be repaid was if Infanti International became profitable because the value of the equipment listed as collateral would not be sufficient to repay the loans. Id., Ex. 1 at 40:22-41:15.

**E.** **Scharpf's Personal Involvement with Infanti International**

As of September, 2000, Infanti was indebted to Amboy for approximately

$500,000. Id. at 90:23-91:3. In need of additional funds to keep his business afloat, Infanti turned again to Scharpf. On September 8, 2000, Scharpf, in his individual capacity, advanced to Infanti International $200,000 in exchange for a collateral promissory note guaranteed by Infanti personally. Id. at 89:18-90:22. As was the case with the promissory notes given to Amboy, the promissory note given to Scharpf provided for a security interest in the equipment, inventory, and receivables of Infanti International. Id. at 91:7-12. Pursuant to a letter agreement entered into with Infanti International at about the same time, Scharpf was also entitled to receive a two dollar facility fee for every chair manufactured. Id. at 118:18-11. Scharpf did not enter into any inter-creditor agreements with Amboy concerning this advance. Id. at 91:20-22.

Though Infanti International never paid any principal or interest on this advance from Scharpf, and Scharpf never received his facility fees, on September 19, 2001, Scharpf loaned an additional $500,000 to Infanti International, again guaranteed by Infanti personally. Id. at 94:18-25. In addition to the other collateral, the note also pledged to Scharpf "100% of [the] stock of Infanti International" and assigned to Scharpf "all patents related to Infanti Versi Chairs." Id. at 95:6-11.

Despite Infanti International's continuous default on the loans, Scharpf made seven additional loans to Infanti International between October, 2001, and February, 2004, all of which were guaranteed by the bankrupt Infanti and secured by the same collateral. Affidavit of George E. Scharpf ("Scharpf Aff."), dated June 6, 2005, ¶¶ 17, 24, 30, 36, 42, 48, 54, 60. When Scharpf was deposed in 2002, he described the personal loans as "investments," admitting that he was not being paid interest, that he was hoping to attain an ownership interest in the company, and that the details on how

Infanti International planned on paying him back were still being worked out. Spizz Aff., Ex. 1 at 100:24-103:4. In 2002, Scharpf hired a private management consultant, whom he paid $10,000, to advise him regarding the company's potential profitability. Id. at 110:24-111:25.

### F. The Demise of Infanti International

Plaintiffs' efforts to enforce the Judgment having proved unsuccessful, they commenced this suit against Infanti International and the companies' nominal owners, the Infanti children, on December 23, 2003. Shortly thereafter, on January 20, 2004, this Court issued an Order appointing a temporary receiver for Infanti International (the "Receiver"). On July 16, 2004, Plaintiffs amended their complaint to add Amboy, Scharpf, and the Receiver as defendants.

The Receiver later determined that the company could not continue to operate as a going concern, and sought to liquidate its assets. Pursuant to an Order of this Court dated March 2, 2005, the Receiver was ordered to sell Infanti International's assets at auction. That auction was held on April 12, 2005, at which time Scharpf bought the assets in a bulk lot for $200,000 in the name of EKI. The Receiver was ordered to retain all proceeds from this sale pending a determination of lien priorities. In a Contempt Order issued on June 2, 2008, this Court found that Scharpf caused the assets of Infanti International to be unlawfully removed from its premises. This aborted the integrity of that sale and intentionally frustrated and obstructed the Order of this Court.

## DISCUSSION

### A.    Default Judgment

Federal Rule of Civil Procedure 55(a) ("Rule 55(a)") provides that the Clerk of Court "shall enter the party's default . . . [when] a party against whom a judgment . . . is sought has failed to plead or otherwise defend as provided by these rules . . . ."[6]  A party moving for default is not entitled to a default judgment as a matter of right.  See J& J Sports Prods., Inc. v. Rodrigues, o5 CV 5805 (RJD), 2007 U.S. Dist. LEXIS 45586, at *6 (E.D.N.Y. Apr. 19, 2007).  The disposition of a motion for default judgment is left to the "sound discretion of [the] district court because it is in the best position to assess the individual circumstances in a given case and to evaluate the credibility and good faith of

---

[6]  The entry of default is a two-step process.  Meehan v. Snow, 652 F.2d 274, 275-76 (2d Cir. 1981).  The moving party must first seek an entry of default by the Clerk of Court under Rule 55(a), and thereafter move for default judgment pursuant to Rule 55(b)(1) or (2).  Upon entry of default, the moving party may seek a default judgment from the Clerk directly by submitting an affidavit if the claim is for a sum certain and the defendant has failed to appear.  See Fed. R. Civ. P. 55(b)(1).  In all other cases, application for default judgment must be made to the court.  See Fed. R. Civ. P. 55(b)(2).  If the defendant has appeared in the action, he is entitled to a hearing on the application, and subsequently, the court may also hold a hearing to ascertain damages.  See id.  The application to the court must append:  "(1) the clerk's certificate of default, (2) a copy of the claim to which no response has been made, and (3) a proposed form of default judgment."  Local Civil Rule 55.2.

Here, neither Plaintiffs nor Amboy followed the proper procedure as set forth by Rule 55(b)(2).  Though the parties moved this Court pursuant to 55(b)(2) for default judgment against Infanti International, they failed to first move the Clerk of Court to enter a default.  The record does not reflect any entries of default against Infanti International, nor does it reflect that certificates of default were issued by the Clerk of Court pursuant to Local Civil Rule 55.1.

The Second Circuit has expressed that following the two step process set forth by Rule 55 is the "preferable course because it avoids the need to prepare for and pursue a damage hearing in those instances where the Rule 55(c) motion is granted."  Meehan, 652 F.2d at 276 n. 5.  However, while a motion for default judgment may be denied based solely on the failure to first obtain an entry of default, it is within the discretion of the district court to entertain the motion even without the technical entry of default.  See id. at 276 (describing failure to move for entry of default a "largely technical" omission); In re Schulman, 196 B.R. 688, 692 (Bankr. S.D.N.Y. 1996) (exercising discretion to decide motion on the merits where plaintiff failed to obtain entry of default and defendant was given notice of motion); In re Roth, 172 B.R. 777, 780 n. 4 (Bankr. S.D.N.Y. 1994) ("[Plaintiff's] failure to obtain an entry of a default is clearly a technical violation which I have discretion to overlook.  I do so here because the hearing on the motion for the entry of a default judgment afforded [defendant] the same opportunity to present mitigating circumstances that he would have had if a default had been entered and a motion to set it aside had been made under Rule 55(c)." (internal citation omitted)).  Because Infanti International had notice of these motions, the Court finds the parties' largely technical errors should not prevent this Court from considering their merits.

the parties." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993); see also Shah v. N.Y. State Dep't of Civil Serv., 168 F.3d 610, 615 (2d Cir. 1999).

Courts may consider numerous factors on a motion for default judgment, including whether the default was willful, whether the plaintiffs would be prejudiced by the denial of the motion for default judgment, whether there are any meritorious defenses to plaintiff's claims, the grounds for default, the amount of money at stake, and the effect of the default judgment on the defendants. See Pecarsky v. Galaxiworld.com, Ltd., 249 F.3d 167, 170-71 (2d Cir. 2001); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981). If a court chooses to grant the default, the defendant is deemed to have admitted every well-pleaded allegation in the complaint, except that the court will hold a hearing to determine damages. Au Bon Pain Corp., 653 F.2d at 65.

The Second Circuit has expressed a strong preference for resolving disputes on the merits. See Enron Oil Corp., 10 F.3d at 95. Courts must establish a balance between "clearing [their] calendar[s] and affording litigants a reasonable chance to be heard." Id. at 96. Default judgment is proper where the procedural rules may aid in "maintaining the orderly and efficient administration of justice." Id. Any doubts as to the proper resolution of a motion for default judgment must be resolved in favor of the defaulting party. Id. at 98.

Infanti International failed to retain replacement counsel pursuant to this Court's Order. A corporation may not appear in federal court unless represented by counsel. See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 202 (1993); Dow Chemical Pacific Ltd. v. Rascator Maritime, S.A., 782 F.2d 329, 336 (2d Cir. 1986). Corporations are artificial entities and therefore may not proceed *pro se*. Jones

v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983). "Where defendant's counsel has been permitted to withdraw and defendant has failed to comply with a court order to obtain replacement counsel, a default judgment is proper." Farberware, Inc. v. Groben, No. 89 Civ. 6240, 1991 U.S. Dist. LEXIS 583, at *4 (S.D.N.Y. Jan. 22, 1991). See also S.E.C. v. Research Automation Corp., 521 F.2d 585, 589 (2d Cir. 1975) ("[W]here a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it pursuant to Rule 55 . . . .").

This Court admonished Infanti International to obtain new counsel at the risk of suffering default motions on the amended complaint. Shapiro, Bernstein & Co. v. Cont'l Record Co., 386 F.2d 426, 427 (2d Cir. 1967) (failure of corporation to appear by counsel after it has been ordered to do so is "cavalier disregard for a court order," and as such the district court should have entered default judgment on the issue of liability and appointed a special master to determine the amount of damages). The default here was clearly willful. Infanti International never retained replacement counsel, nor has it opposed this motion.

A default judgment would not prejudice Infanti International because its assets have been sold at auction and it is no longer in business. The remaining litigation is over the proper distribution of its assets being held by the Receiver. Neither a declaration that Infanti International is the successor in interest to Infanti Chair nor a declaration that Infanti International owes Amboy and Scharpf the monies which they advanced would affect the priority of creditors – Amboy has admitted that Gasser's claim is superior to its own, and the priority of Sharpf's interest is the subject of the pending motion for partial summary judgment. Therefore, for the foregoing reasons,

this Court grants the default judgments requested by Plaintiffs, Amboy, and Scharpf. The default judgment moots Amboy's remaining claim on its motion for partial summary judgment. Thus, the only remaining motions for this Court to consider are the motion to strike the Spizz Affidavit, and Scharpf's motion for partial summary judgment.

### B.    Motion to Strike Spizz Affidavit

Defendants argue that this Court should strike the Spizz Affidavit because it is "replete with outrageous accusations, conclusory allegations, opinion and legal argument." Amboy Reply Br. at 3. Although Defendants challenge the Affidavit pursuant to Federal Rule of Civil Procedure 56(e) ("Rule 56(e)"), they do not challenge the authenticity of the documents attached to the Affidavit.

Rule 56(e) provides that affidavits submitted with respect to summary judgment motions "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." While a court may strike portions of an attorney's affidavit that contain inadmissible hearsay, some degree of characterization of attached documents is permissible. See New York v. Solvent Chemical Co., 218 F. Supp. 2d 319, 331 (W.D.N.Y. 2002). Rather than striking conclusory assertions made in an attorney's affidavit, the court is free to search the record for support. See First City Fed. Sav. Bank v. Bhogaonker, 684 F. Supp. 793, 798 (S.D.N.Y. 1998).

Therefore, the Court finds that the Spizz Affidavit was merely a vehicle placing before the Court relevant, admissible documents and the relevant portions of sworn testimony of witnesses with personal knowledge. The Spizz Affidavit is not being

presented to a jury, and the Court can "draw its own conclusions based on th[e] evidence, not based upon an attorney's characterizations of it." Solvent Chemical, 218 F. Supp. 2d at 331.

### C. Summary Judgment

Summary judgment is appropriate when there are "no genuine issues as to any material fact[s] and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). A genuine issue exists if a reasonable jury could find in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party has the burden to demonstrate that no genuine issue of material fact exists, and the Court must draw all reasonable inferences in favor of the non-moving party. Id. at 255. The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998); see Ostensen v. Suffolk County, No. 05-4456-cv, 2007 U.S. App. LEXIS 12183, at *2 (2d Cir. May 23, 2007) ("[I]n opposing a motion for summary judgment, the non-moving party may not rely on conclusory allegations or unsubstantiated speculation.").

The Court's role in a motion for summary judgment is one of "issue-finding," not "issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Therefore, the Court's charge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

Whether Scharpf has priority over Plaintiffs to the proceeds of the auction is

dependent on whether the monies advanced by Scharpf were intended as loans or investments.  Plaintiffs assert that summary judgment cannot be decided in Scharpf's favor because the purported loans made to Infanti International were actually capital contributions.[7]  Whether "advances to a corporation are contributions to capital or loans" is a question of fact that should take into account all the circumstances of a particular case.  Gilbert v. Comm'r of I.R.S., 262 F.2d 512, 513 (2d Cir. 1959).[8]  To determine whether an advance is a capital contribution or a bone fide loan, courts look at various criteria that fall into three general categories:  "(1) the form of the instruments; (2) the intent of the parties[;] and (3) the objective economic reality as it relates to the risks taken by investors."  Fuscaldo v. United States, 00 CV 2486, 2001

---

[7]  While Plaintiffs stated their argument as one of equitable subordination, their argument is more properly characterized as a recharacterization of the loans from debt to equity.  While

> the effect of a . . . court's recharacterization of a claim from debt to equity may be similar to . . . subordination of a claim through equitable subordination in that, in both cases, the claim is subordinated below that of creditors. . . . the extent to which a claim is subordinated under each process may be different. . . . Recharacterization cases turn on whether a debt actually exists, not on whether the claim should be equitably subordinated.  In a recharacterization claim, if the court determines that the advance of money is equity, and not debt, the claim is recharacterized and the effect is subordination of the claim as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation.  In an equitable subordination analysis, the court is reviewing whether a legitimate creditor engaged in inequitable conduct, in which case the remedy is subordination of the creditor's claim to that of another creditor only to the extent necessary to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective.

In re Autostyle Plastics, Inc., 269 F.3d 726, 748-49 (6th Cir. 2001) (internal citations and quotes omitted).

[8]  In Gilbert, the court addressed whether advances made by a shareholder of a company were capital contributions or loans that would entitle the shareholder to deductions under the tax code.  Defendants argue that these cases are not applicable to Scharpf because he was not an insider of the company.  However, the collateral pledged to Scharpf included 100% of the stock of Infanti International.  Thus, it is arguable that Scharpf was an insider.  Therefore, the Court will consider whether a trier of fact could find that these purported loans were actually investments.

-17-

U.S. Dist. LEXIS 18830, at *15 (E.D. Pa. Oct. 30, 2001) (quotation omitted).[9]

The Court concludes that Scharpf is not entitled to the relief he seeks because it is clear that he was an investor in Infanti International. While the form of the instruments for the first seven "loans" ostensibly establish that the principal and interest were to be paid on the first day of each calendar quarter and at maturity dates set by the instruments, with the interest rate set at 8% per annum, these dates and payments were repeatedly ignored.[10] See Scharpf Aff., Exs. A-G. It is clear that Scharpf's intent was for the advances to be investments in the company and not loans. When Scharpf was deposed in 2002, he described the personal loans he made to Infanti International as "investments," admitting that, despite the fixed maturity dates and interest rates, he was not actually being paid interest, that he was hoping to attain an ownership interest in the company, and that the details concerning repayment were still being worked out.

---

[9] These three categories summarize the following factors:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; [and] (11) the presence or absence of a sinking fund to provide repayments.

In re Franklin Indus. Complex, Inc., 01 CV 67459, 2007 Bankr. LEXIS 3004, at *48 (Bankr. N.D.N.Y. Aug. 30, 2007). Bankruptcy courts have adopted tests similar to the one above which is used in determining whether an investment is debt or equity in the context of assessing income tax liability. While these tests "undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity in the court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else." In re SubMicron Sys. Corp., 432 F.3d 448, 456 (3d Cir. 2006); see also In re Adelphia Commc'ns Corp., 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007) ("Recharacterization cases turn on whether a debt actually exists – not on whether the claim should be equitably subordinated or disallowed.").

[10] The last two collateral promissory notes do not include maturity dates, despite the fact that the documents require payment at maturity. See id., Exs. H & I.

Spizz. Aff., Ex. 1 at 100:24-103:4.  Indeed, members of Amboy's Board of Directors testified that they were unaware that Scharpf ever "loaned" money to Infanti International.  Id., Ex. 12 at 33:17-23, Ex. 8 at 19:1-4.  Instead, Amboy's Chief Financial Officer testified that Scharpf fully disclosed to the Board that he was a "private investor" in the company.  Id., Ex. 8 at 17:22-14.

Scharpf took risks more akin to those undertaken by investors, not lenders. Unlike a lender, Scharpf never safeguarded his interest in the debt.  Though aware that Infanti International was in repeated default on the monies advanced by Amboy, and that Gasser had an outstanding judgment against Infanti, Scharpf never requested any financial statements or that the company provide an audit of its business.  Scharpf admitted that the collateral of the company was not worth much, and that if he had to rely on Infanti's guarantees, he would likely recover nothing.  Instead, he testified that he relied primarily on the assurances of Infanti, with whom he had been friends for nearly twenty years, that the company would eventually become profitable and he would be able to recoup his money as an owner in the business.  He even hired a consultant to determine the company's future profitability.  Thus, the economic reality of Scharpf's advances is "illustrated in [his] testimony that repayment was contingent upon the company's success . . . ."  Fuscaldo, 2001 U.S. Dist. LEXIS 18830, at *18 (finding loans to be investments where repayment is "dependent on the fortunes of the business, which is more typical of a capital contribution."); Autostyle Plastics, Inc., 269 F.3d at 751 ("If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution.").

Because the "loans" are instinct with the characteristics of investments, summary

judgment as to defendant Scharpf must be denied. Given this conclusion, a finding by the Court that the conveyances made to Scharpf were fraudulent would be superfluous. Accordingly, the Court *sua sponte* grants summary judgment in favor of Plaintiffs on their claim that they have priority over Scharpf to the proceeds of the sale held on April 12, 2005.

## CONCLUSION

For the foregoing reasons, the motions for default judgment are GRANTED, and Defendants' motions to strike the Spizz Affidavit and for partial summary judgment are DENIED. The Court GRANTS summary judgment in favor of Plaintiffs *sua sponte* as to their claim that their lien is superior to those held by Amboy and Scharpf.

SO ORDERED.

Dated:       Brooklyn, New York
               July 23, 2008

_____/s/_____
I. Leo Glasser
United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

Counsel for Plaintiffs:

Alex Spizz, Esq.
Todtman, Nachamie, Spizz & Johns PC
425 Park Avenue, 5th floor
New York, New York 10022

Counsel for Defendant George Scharpf:

Gerald Krovatin, Esq.
Krovatin & Associates, LLC
744 Broad Street, Suite 1903
Newark, New Jersey 07102

Counsel for Defendant Amboy National Bank:

Dennis Thomas Kearney, Esq.
Pitney Hardin Kipp & Szuch
P.O. Box 1945
Morristown, New Jersey 07962

Counsel for Defendant Sanders W. Gropper:

Stan L. Goldberg, Esq.
Platzer, Fineberg, Karlin, Levine, Goldberg & Jaslow, LLP
1065 Avenue of the Americas, 18th Floor
New York, New York 10018