UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
GEORGE GASSER and
GASSER CHAIR COMPANY, INC.,

                          Plaintiffs,

       -against-

INFANTI INTERNATIONAL, INC.,
MARK INFANTI, NANCY APONTE
INFANTI, VITTORIA INFANTI,
MARGUERITA INFANTI, MARIELLA
INFANTI, AMBOY NATIONAL BANK,
GEORGE E. SCHARPF and SANDERS W.
GROPPER, in his capacity as Receiver of
Infanti International, Inc.,

                          Defendants.
-------------------------------------------------x

MEMORANDUM AND ORDER
03 CV 6413 (ILG)

GLASSER, United States District Judge:

      Pending before the Court is the determination of the compensatory damages,

attorney's fees and costs to be awarded to the plaintiffs as the sanction to be imposed

upon Amboy Bank and George Scharpf, who were found jointly and severally liable for

their flagrantly willful contempt of an Order of this Court. See 2008 WL 232367

(E.D.N.Y. June 2, 2008), to which references will be made hereafter, notwithstanding

that familiarity with it will be assumed.

      More than twenty years ago, on December 20, 1988, the plaintiffs, commenced an

action against Vittorio Infanti ("Infanti") and the Infanti Chair Mfg. Corp. ("Infanti

Chair"), seeking redress for allegedly infringing their patent for protective plastic

bumper edges for chairs made by them.  It was undisputed that Infanti knew about

Gasser's patent since 1979, and when advised of his infringement, agreed to cease

manufacturing and selling the infringing chairs.  It was also undisputed that Infanti

breached his agreement and continued to manufacture and sell the chairs despite the repeated notifications of his infringement and requests to desist, which he ignored. This action was then commenced.

Infanti's response to the complaint was to file a motion for summary judgment asserting that the claim of infringement is barred by laches and equitable estoppel, by the doctrine of functionality and by the time bar regarding the breach of his agreement. In a Memorandum and Order ("M&O), reported in 1991 WL 180619 (E.D.N.Y. 1991), the Court found that Infanti established the elements of equitable estoppel and laches and the Counts of the complaint alleging infringement of the patent were dismissed. As to the assertion that the plaintiff's claim of trademark infringement was barred by the doctrine of functionality, the Court found that Infanti provided no factual basis to support that claim and his motion for summary judgment as to those Counts was denied. The Court went on, however, to dismiss the trademark counts on grounds not raised by Infanti, namely laches and estoppel and dismissed the breach of contract claim on the same grounds.

Gasser appealed this Court's determination as to all but the contract claim. The Court of Appeals for the Federal Circuit, in an opinion reported in 60 F.3d 770 (Ct. A. Fed. Cir. 1995), reversed the dismissal and remanded to this Court for further proceedings. Familiarity with that opinion will be assumed.

Upon its return to this Court, the case was tried without a jury over a period of seven days. Testimony was heard from numerous witnesses and voluminous exhibits were presented. Based upon that evidence, the Court made comprehensive findings of fact which traced the creation and evolution of the "Gasser chair" and concluded as a

matter of law: That the plaintiffs' patent was valid; that it was flagrantly and willfully infringed by Infanti Chair and that Vittorio Infanti was personally liable for the infringement; that Infanti Chair and Infanti were jointly and severally liable for lost profits, reasonable royalties and prejudgment interest; that they were also jointly and severally liable for enhanced damages in the sum of $1,000,000 given the flagrant and willful infringement which also made an award of attorney's fees and costs appropriate; that the plaintiffs' trade dress rights were established and that the defendants and others described were enjoined as provided and the defendants were directed to deliver to the plaintiffs' attorney for destruction all the enumerated infringing items. Gasser Chair Co., Inc. and George Gasser v. Infanti Chair Mfg. Corp., 943 F. Supp. 201 (E.D.N.Y. 1996).

The defendants moved the Court of Appeals for the Federal Circuit for a stay pending appeal of the injunction and of the execution on the $15 million judgement issued by this Court. The Court of Appeals held that because the injunction did not comply with Fed. R. C. P. 65(d) in that it didn't sufficiently describe the products affected by it and did not state what the protected trade dress is, this Court's judgment was vacated and the case was remanded for further proceedings "in the interest of judicial efficiency and the conservation of the parties resources." 95 F.3d 1165 (Ct. A. Fed. Cir. Aug. 1, 1996).

Almost immediately thereafter, on August 9, 1996, a judgment was entered in which a new injunction was ordered setting forth the specific features of the chairs in which the plaintiffs established trade dress rights and specifically identifying the chair as embraced by the injunction. See 1996 WL 683240.

3

Following the issuance of that injunction, the parties returned to this Court on

several occasions for a determination of whether a chair manufactured or proposed to be

manufactured by the defendants runs afoul of the injunction. A variety of defendants'

chairs were placed side by side with Gasser's chairs and Infanti requested the Court's

direction. In a Memorandum and Order discussing the applicable principles and

relevant considerations, the Court concluded that all but one of the Infanti chairs hewed

too close to the prohibited margin line, stating: "The reasons for that conclusion may not

be capable of precise articulation. But I have no doubt that I knew what bred the seeds

of confusion when I saw it." See 1997 WL 37034.

The defendants also appealed the judgment of August 9, 1996, *supra*. The Court

of Appeals for the Federal Circuit in an opinion reported in 155 F.3d 565 (Ct. A. Fed. Cir.

1998) affirmed that judgment.

Those decisions marked only the beginning of an extended course upon which the

defendants embarked for the sole purpose of frustrating the satisfaction of the

judgment. Conveyances and other transactions to achieve that objective were entered

into the merit or legal viability of which were of only minor, if any, concern. The only

relevant consideration was the evasion of the obligation to pay the judgment rendered

against them.

The tale of the litigation that followed will now be told.[1]

---

[1] The twisted bends and turns over which the tale unfolded is told in Gasser v. Infanti International, 1991 WL 10931 (E.D.N.Y. 1991); 1991 WL 180619 (E.D.N.Y. 1991); 953 F. Supp. 201 (E.D.N.Y. 1996); 1996 WL 683240 (E.D.N.Y. 1996); 1997 WL 37034 (E.D.N.Y. 1997); 2004 WL 906487 (E.D.N.Y. 2004); 2004 WL 1243114 (E.D.N.Y. 2004); 353 F. Supp.2d 342 (E.D.N.Y. 2005); 358 F. Supp.2d 176 (E.D.N.Y. 2005); 363 F. Supp.2d 508(E.D.N.Y. 2005); 2006 WL 297451 (E.D.N.Y. 2006); 2006 WL 616267

A brief account will be given of the obstacles strewn in the path of the plaintiffs' pursuit of the satisfaction of their judgment. Their determination to achieve the justice which was their due, regardless of the cost in money, time and effort, was manifested by the extensive litigation those obstacles spawned and from hurdling which they would not be deterred.

The account that follows is a distillation of the facts and conclusions of law recited in the many opinions to which the unending litigation gave rise. Citations to those opinions are sprinkled throughout and will, I believe, refresh the familiarity with them which is assumed.

The ink on this Court's judgment of August 9, 1996 had hardly dried when on August 28, 1996, Infanti Chair filed a petition pursuant to Chapter 11 in the United States Bankruptcy Court for the Eastern District of New York. The plaintiffs' judgment against it was not discharged in that proceeding. Infanti Chair terminated its business and was dissolved. Infanti himself also filed a petition pursuant to Chapter 11 in the United States Bankruptcy Court for the District of New Jersey on September 18, 1996. The plaintiffs' judgment against him was also not discharged in that proceeding.

Infanti Chair owed Amboy National Bank ("Amboy") approximately one million dollars at the time it filed for bankruptcy, loans which, incidentally, were never repaid. Amboy did, however, following the bankruptcy, foreclose a mortgage it held on the factory buildings Infanti Chair owned and MES Realty, a wholly owned Amboy subsidiary, acquired ownership of the property at the foreclosure sale.

---

(E.D.N.Y. 2006); 2008 WL 2323367 (E.D.N.Y. 2008); 2008 WL 2409244 (E.D.N.Y. 2008); 2008 WL 2876531 (E.D.N.Y. 2008).

George P. Scharpf ("Scharpf"), Amboy's president who was authorized to make loans on its behalf, advised Infanti that Amboy would consider loaning him more money if he formed a new corporation that would be owned by his children.

On February 9, 1999, Infanti incorporated Infanti International, Inc. and was enabled to do so, in large part, due to a loan of $1,300,000 made to him personally by Amboy National Bank, notwithstanding that at the time Infanti was an adjudicated bankrupt and a judgment debtor for $15 million. See M&O, 2008 WL 2876531 for an account of the monies advanced to Infanti International by Amboy.

The dissolution of the bankrupt Infanti Chair and the incorporation of Infanti International, Inc. for the purpose of conducting essentially the same chair manufacturing business on the same premises was seen by the plaintiffs as an obvious device to evade responsibility for the $15 million judgment. Determined not to permit their judgment to be so transparently undermined, the plaintiffs sought and obtained a judgment declaring Infanti International to be a successor in interest to Infanti Chair and liable for the payment of Gassers' judgment.

On January 8, 2004, in response to an Order to Show Cause filed by the plaintiffs, the Court, *ex parte*, preliminarily enjoined Infanti International ("the Corporation"), from transferring or encumbering any of its property and enjoined the individual defendants named there from transferring or encumbering their shares of stock. In addition, Infanti's daughter, Vittoria, was enjoined from transferring or encumbering a patent assigned to her.[2] On that day, the Court also appointed Sanders W. Gropper ("S.

---

[2] Sometime after the Corporation was formed, Vittorio Infanti designed a chair he named the "Versi-Chair" for which he obtained a patent on October 24, 2000.

Gropper"), Temporary Receiver of the Corporation and authorized him to take control of the Corporation's assets and directed the Corporation's officers, directors and employees to transfer those assets to the Receiver.

On January 23, 2004, Gary Gropper ("G. Gropper"), acting on behalf of the Receiver, presented Elizabeth Infanti, a/k/a Elizabeth Kavklakian, Vittorio Infanti's then wife, with a copy of the Court's Order. Acting upon the advice of counsel for Amboy, she denied him access to the premises. The plaintiffs' immediate response was an Order directing the Corporation, Infanti and his wife to show cause why they should not be held in contempt of the Court's order. The defendants obtained an Order, which they subsequently withdrew, directing the plaintiffs to show cause why the Order appointing the Receiver should not be vacated. The plaintiffs also obtained a second Order directing Amboy, Scharpf and EKI, Inc.[3] to show cause why the Court's Order of January 8, 2004 was not binding upon them and why they should not be held in contempt for disregarding it.

A hearing was held over a period of three days on both Orders and in a M&O reported in 2004 WL 906487, findings of contempt were made against the Corporation, Mrs. Infanti, Amboy Bank and George Scharpf[4] with the observation that "Initial

---

[3]EKI was a corporation formed and owned by Scharpf who, together with Elizabeth Kavlakian (hence EKI) operated a chair manufacturing business on the premises.

[4]The basis for the finding of contempt was succinctly stated to be that "The bank thus made a unilateral determination that its perfected security interest had a preference over this Court's Order when prudence should have counseled to seek a judicial determination of that issue." That unilateral determination manifested an indifference to and disregard of this Court's Order and was contemptuous of it.

compliance with the Court's Order would have made unnecessary the commencement of two contempt proceedings to achieve it."

A third Order was directed to the named defendants and to non-named original parties Amboy Bank and George Scharpf to show cause whey they should not again be held in contempt of the Court's Order of January 8th. That Order was based on sworn testimony given by Scharpf on March 9, 2004 that no monies were taken from the business of the Corporation which he understood to be its property. Unknown to the Court at that time was a letter notification by Amboy, dated February 10, 2004, to a Corporation customer stating that by virtue of its security interest, monies currently due the Corporation in the sum of $178,000 should be forwarded to Amboy. The customer complied. A request by the Receiver for the delivery of that sum to him was rejected, and this third Order to Show Cause followed. In an M&O dated April 16, 2004, a finding of a second contemptuously flagrant violation of the Court's Order was issued against Amboy and a fine of $5,000 was imposed. The plaintiffs were yet again caused to incur counsel fees which Amboy was directed to pay, counsel fees that were incurred in vindicating the authority of this Court once again flagrantly violated and incurred incident to a persevering effort to satisfy a judgment. The conduct designed to frustrate the satisfaction of the judgment was now not only the conduct of Infanti, the judgment debtor, but of Scharpf and Amboy who aided and abetted him ostensibly in furtherance of their own alleged interests. See, e.g., 2004 WL 906487 and 353 F Supp.2d 342.

The plaintiffs were then confronted with another obstacle to the satisfaction of their judgment, the assignment of Vittorio Infanti's patent on his "Versi-Chair" to his daughter Vittoria. That caused an action to be commenced against the Corporation and

named defendants who included Infanti's children, Amboy Bank, George Scharpf and the Receiver, to set aside the conveyance as fraudulent. Although it was undisputed that Infanti received no value for the assignment (he testified that it was a gift), the defendants argued that Infanti having been the President of Infanti International at all relevant times, he was obliged to assign the patent to the Corporation. In support of the contention that Infanti was President of the Corporation at all relevant times, the Senior Vice President and Chief Financial Officer of Amboy submitted two revolving credit notes, an accompanying security interest and financing statements and stated in an affidavit that those documents were signed by Infanti acting as President of the Corporation. Amboy later submitted a letter in which it acknowledged that his affidavit on that point was at best incorrect, or at worst, false. In an extended discussion of the facts, the Court found that at the time of the assignment in 1999, Infanti was not the President of the Corporation. The Court also concluded, as a matter of law, that for the reasons extensively given, the Corporation had no valid claim to Infanti's patent and that Amboy did not have a superior security interest if, indeed , it had a security interest at all. The Court declared the conveyance of the patent from Infanti to his daughter fraudulent, and the plaintiffs sought to levy execution on it. Realizing that an interest in a patent cannot be obtained through execution, the plaintiffs moved the Court for an Order pursuant to Rule 69(a), directing delivery of the patent to the United States Marshal or, alternatively, to a receiver appointed pursuant to N.Y.C.P.L.R. § § 5225(a), 5228(a).

A hearing on that motion was subsequently held. Scharpf, in his individual capacity, having loaned Infanti substantial sums, opposed the motion asserting a

superior security interest in the patent. Thus, having to confront still another roadblock in pursuit of a claim which was rightfully theirs, yet another review of the relevant historical facts and of the application of the law as revealed in the New Jersey Uniform Commercial Code, was undertaken by the Court which held that Scharpf never perfected his security interest in the patent to the extent that he ever had one. The plaintiffs' motion for the appointment of a receiver was granted. See 2006 WL 297451 (E.D.N.Y. 2006).

It is a well settled principle of law that when a federal court appoints a receiver to administer the assets of an entity, the federal court obtains jurisdiction over the property and over claims to its property. Wabash R. Co. v. Adelbert College, 208 U.S. 38 (1908). "No one can obtain any part of the assets . . . in the possession of a receiver, except upon application to the court which appointed him." Riehle v. Margolies, 279 U.S. 218 (1929). Completely ignoring those long established fundamental rules, or perhaps more accurately, making no effort to find and consult them, Amboy and Scharpf commenced an action in the Supreme Court of the State of New York, County of Richmond, without the prior consent of this Court, seeking an Order that would grant them the authority to seize the property of the Corporation and directing the Sheriff of any county where the property is found to seize it and, if necessary, forcibly enter the premises to do so. Named as defendants were Infanti International, Inc., S. Gropper, the Receiver, and three Infanti children. That improvident and legally flawed action necessitated a fourth Order sought by the plaintiffs, directing the non-parties, Amboy National Bank and Scharpf, to show cause why the action they commenced in the state court without the prior consent of this Court, should not be stayed. Amboy and Scharpf

10

opposed the motion in regard to which the Court wrote: "The Bank and Scharpf knew, or should have known, that they can derive no comfort from 28 U.S.C. § 959(a) in commencing their state court action without the consent of this Court (n.1) is evidenced by cases they themselves cited in opposition to this Order to Show Cause . . . ." In the footnote, the Court referenced an affirmation made by Amboy and Scharpf which, remarkably, states: "In light of the receivership order entered by the federal court, it is unclear whether plaintiffs may seek an Order of Seizure from this Honorable Court without infringing upon the jurisdiction of the federal court that previously granted the receiver." Given the ancient and clear authority of Wabash R. Co. and Riehle, supra, their assertion that it was "unclear" whether the Order they sought from the state court was warranted was disingenuous and misleading. The stay of the state court proceedings requested by the Gassers was granted in an M&O reported in 2004 WL 1243114.

In December of 2004, the Receiver moved this Court to approve the payment of an interim commission for services rendered. Amboy opposed the motion asserting that the Receiver was not entitled to commissions until the receivership is terminated; that the amount he seeks is excessive and cross moved to discharge him alleging that he failed to perform his duties adequately and that his services were unnecessary. In an M&O dated March 2, 2005, and reported in 358 F. Supp.2d 176, the Court granted the Receiver's motion for interim compensation and approved his first intermediate account. For the reasons stated in that Order the Receiver was directed to conduct a public sale of all the assets of Infanti International, excluding the patent. The Order also directed the Corporation to vacate the building it occupied which was owned by Amboy (or MES?). The Corporation's lease was terminated by Amboy for non-payment of rent

11

thus also terminating its right to possession. Amboy was directed not to interfere with the Receiver's access to the premises and his possession of the Corporation's assets until the public sale was consummated and the assets sold. Pending that event, the Order provided that Amboy "shall be deemed a bailee of the assets charged with all the obligations of that status."

Note should be taken of the fact that throughout the many proceedings described and discussed thus far, Amboy persisted in asserting the priority of its security interest over Gasser's judgment, but in March 2008, Amboy moved this Court for an Order pursuant to Rule 41 Fed. R. C. P. that would dismiss all claims by Gasser against it as well as the counterclaims it asserted against Gasser. The basis for that motion was a settlement offer made by Amboy to Gasser, which Gasser refused to accept. Therefore, Amboy contended, the refusal by Gasser to accept an offer of a judgment for the very relief it seeks requires that it be dismissed from the action. Noteworthy is the fact that in its offer of settlement Amboy conceded that it does not have priority over the plaintiffs for any of its security interest liens on Infanti International's property and agreed to dismiss any counterclaims against the plaintiffs asserting such priority. The settlement offer also included an offer to provide an adjudication that Gasser's judgment lien is superior to any security interest lien held by its president, George Scharpf. In an M&O dated June 10, 2008, and reported in 2008 WL 2409244, Amboy's motion was denied for the reason that Rule 41(a) plainly provides that it is only the plaintiff who can move for voluntary dismissal. Rule 41(b) does permit a defendant to so move, but only when the plaintiff fails to "process his case diligently." That exception was clearly not available to Amboy.

On April 12, 2005, the auction sale the Receiver was directed to conduct took place. Scharpf was the successful bidder [in the name of EKI] for the assets of Infanti International in a bulk lot for $200,000. The Receiver was ordered to retain all proceeds from this sale pending a determination of lien priorities.

Some seven months later, in November 2005, the annual chair industry show was in progress at the Javits Convention Center in New York. Mark Gasser and Vittorio Infanti were in attendance. At Infanti's request, Mark Gasser met with him and was told that prior to the auction sale, equipment, key components of the chair manufacturing business was removed at Scharpf's behest. A motion to reopen discovery was then made by the plaintiffs and granted on March 3rd, 2006. Docket #312. An intensive investigation of the facts the relentless discovery revealed gave rise to a motion sought by the plaintiffs that would declare Amboy and Scharpf in civil contempt for knowingly and intentionally obstructing and frustrating the Order of this Court directing the sale of Infanti International's assets. A hearing was held on November 6, 7 and 8, 2007, at the conclusion of which the Court made findings of fact which can only be described as shocking and drove the Court to the inescapable conclusion that "Scharpf was knowingly and intentionally contemptuous of the Order of this Court in that he knowingly and intentionally obstructed and frustrated the effectuation of that Order and that he and Amboy are jointly and severally liable for the consequences of his actions." The facts which mandated that conclusion were established by the testimony of witnesses and exhibits which are extensively described in 2008 WL 2323367 (E.D.N.Y. June 2, 2008). That Order concluded with a direction to the parties to appear before the Court on June 26, 2008, at which time a hearing will be held for the purpose of determining the

13

monetary and such other relief to which the plaintiffs may be entitled. The parties were also directed to file, simultaneously, memoranda of law addressing the scope of relief the Court may grant.

The last Memorandum and Order issued by the Court, dated July 23, 2008, addressed Gassers' claim, among others, to set aside a series of fraudulent conveyances and impose liability for the judgment, which after twelve years still remained unpaid, on Infanti International as successor in interest to Infanti Chair. They also claimed that they had a first priority lien on Infanti International's property superior to Scharpf which he had continuously asserted had priority. The Bank and Scharpf cross-claimed against Infanti International to recover monies they advanced to it, and counterclaimed against Gasser to assert that they held the superior rights to the property of Infanti International. The determination of those claims and the various motions addressed to them would determine the disposition of the proceeds of the auction sale which has been previously discussed.

In the interim, counsel for Infanti International was granted leave to withdraw because its bills had not been paid. The Corporation was advised that it could not appear *pro se* and new counsel must enter a notice of appearance within twenty days, failing which, judgment by default may be obtained against it in any subsequent proceedings. New counsel never appeared and Gasser moved for a default judgment and a declaration that Infanti International was a successor in interest to Infanti Chair and therefore liable for Gasser's judgment.

Amboy moved for partial summary judgment that would declare that Infanti International was indebted to it for the amount of several loans made and that it holds a

14

first priority lien superior to Gasser's judgment and therefore entitled to the proceeds of the auction sale. However, as was previously described, Amboy conceded the superiority of Gasser's judgment in its unsuccessful motion to dismiss Gasser's claims pursuant to Rule 41, Fed. R. C. P., therefore its motion as to this claim was moot and summary judgment was granted to the Gassers on their claim of priority over Amboy to the proceeds of the sale.[5]

Scharpf, acting *pro se*, also filed motions for partial summary judgment. He too sought a declaration that Infanti International is indebted to him for loans he personally made to the Corporation and that his lien is superior to all creditors except Amboy. He also moved for a default judgment against the Corporation for the amount of the loans he made.[6]

In a Memorandum and Order dated July 23, 2008 and reported in 2008 WL 2876531, familiarity with which will be assumed, the default judgments against Infanti International requested by the Gassers, Amboy and Scharpf were granted. The defendants' motions for partial summary judgment were denied. Gasssers' motion for summary judgment that their judgment lien is superior to liens held by Amboy and Scharpf was granted. The resolution of the conflicting claims of priority having thus been made, the proceeds of the auction sale which were being held by the Receiver pending that resolution should be distributed to the Gasser plaintiffs.

---

[5]The amount of loans exceeded $1,390,000 upon which no interest was paid and secured by the personal guarantee of Vittorio Infanti; an adjudicated bankrupt with no assets. See 2008 WL 2876531 * 4. None of the loans were ever repaid.

[6]Scharpf's personal loans to the Corporation totaled approximately $800,000, also guaranteed by Infanti and never repaid. 2008 WL 2876531 * 5.

The parties appeared as directed on June 26, 2008. At the outset, the Court announced that the purpose of the hearing was to provide the parties the opportunity to express their views regarding the monetary and other sanctions that may appropriately be imposed as a matter of law given the findings of civil contempt. Memoranda of law on that issue were submitted simultaneously two weeks prior to the hearing. No testimony was to be received at the hearing. The facts conclusively establishing the contempt necessarily entailed extensive evidence elicited from many witnesses and through many exhibits establishing the means by which the obstruction and frustration of the Court ordered auction sale was accomplished, namely the removal of the machinery and equipment indispensable to the manufacture of chairs prior to the sale, and the harm which naturally and inevitably flowed from that contemptuous conduct were already found and recited in 2008 WL 2323367.

The law regarding the sanctions properly imposed given a finding of civil contempt is well settled. In contrast to a finding of criminal contempt where the sentence imposed is punitive and primarily intended to vindicate the court's authority, the sanctions for civil contempt although also imposed to vindicate the authority of the Court are not punitive but rather corrective. Those sanctions are designed to serve two purposes, namely, to coerce the contemnor to comply with the Court's order and to compensate the aggrieved party for the harm caused by the contemptuous conduct. The coercive purpose to be served is here moot. Would there were authority to coerce the payment of the judgment debt rightfully owed and enjoin those who would seek to evade its payment or aid and abet its evasion from doing so. The other purpose to be served is corrective, that is to say, to compensate the victim of the contempt for all the damages

16

proximately and foreseeably caused. In addition, if the contemptuous conduct was willful, attorney's fees and costs incurred in prosecuting the contempt may also be awarded. Weitzman v. Stein, 98 V.3d 717 (2d Cir. 1996). An important corollary to that rule, particularly relevant here, is applicable in the case where the defendant has prevented a precise computation of damages by his own wrong. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251 (1946), was such a case in which Chief Justice Stone wrote at 264-65:

> '. . . where the defendant by his own wrong has prevented a more precise computation . . . a just and reasonable estimate of the damage based on relevant data [may be made]. Any other rule would enable the wrongdoer to profit by his own wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.

> Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

> The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. That principle is an ancient one . . . ."

A citation of the cases which have consistently applied this corollary rule, even only those of the second circuit, would be an affectation of research. The damages caused to the estate of the Receivership which had not yet been terminated took several forms. Primarily the harm was sustained to the Receivership by the contemnors unlawful exercise of dominion and control, that is, the conversion of its assets, by the reduction of the bulk value of those assets and, by virtue of that reduction, the potential loss of the proceeds of the auction sale. The damages suffered as a direct and

17

foreseeable result of the defendants' contempt also included the Receiver's legal fees and expenses incurred in connection with the contempt proceeding and the attorney's fees, costs and expenses incurred by the plaintiffs because of the wilfully contemptuous conduct of the defendants.

The damages sustained by the Receivership and ultimately by the Gassers was incapable of precise computation. Proof of damages sustained by them was provided by photographs, by the relevant testimony of witnesses, and primarily by the testimony of Mark Gasser who has been employed by Gasser Chair for more than thirty years. He is the executive vice president of that company. In that capacity he is involved in its day to day management, the selection of machinery and equipment, the hiring of upper level management, the management of the factory, and sales management. He became involved and knowledgeable about machinery and equipment from the time he was in high school and became apprenticed, in effect, to his uncle who was a tool and die maker and one of the founders of the company. He has been purchasing machinery and equipment for the company for approximately 30 years. (Tr. at 4-7).

Before turning to the testimony of Mr. Gasser, I should note that whether his testimony was received as expert testimony is a matter over which the Court has broad discretion General Electric v. Joiner, 522 U.S. 136, 142 (1997); McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir. 1995) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous.") Given his lifelong experience in every stage and facet of the manufacture of chairs, his qualification as an expert in that regard cannot be gainsaid. He was also intimately familiar with the type of equipment used by Infanti Chair and Infanti

18

International because they made essentially the same chairs as were made by Gasser, some of them being identical. (Tr. at 6-7). His testimony explaining the function of the specific pieces of machinery and equipment used by Infanti in manufacturing his chairs manifested that intimate familiarity (Tr. at 20-68).

The testimony of Vittorio Infanti describing the function of the machinery and equipment he used in manufacturing chairs was entirely consistent with the testimony of Mark Gasser. (Tr. at 312-332).

An objective and critical reading of his testimony, however, would lead to the conclusion that it was based entirely on his intimate knowledge of the subject and was fact rather than opinion based. If a semantically colloquial reading of "probably" would suggest opinion or if the form of the question put to him would, i.e., "Do you have an opinion as to the value of these dies?" (Tr. at 72/16), then his opinions are accepted and together with all other relevant evidence forms the basis for my findings of fact. I would add that having observed Mark Gasser as a witness on the several occasions when he was called upon to testify in the course of this tortuous litigation, he impressed me as a person who understood the solemnity of an oath and was incapable of testifying falsely or dissembling even where his interests would be served by doing so. I was acutely aware of my unflattering assessment of Vittorio Infanti's credibility on a prior occasion, see Gasser Chair Co. v. Infanti Chair Mfg. Co., 943 F. Supp. 201 (E.D.N.Y. 1996), and with that awareness appraised his testimony on this occasion with great care. A consideration of the circumstances which motivated his testimony on this occasion, his testimonial demeanor and for the reasons given in 2008 WL 2323367 * 6, I found his testimony entirely credible.

19

The machinery and equipment which were the property of Infanti International and should have been, but weren't, available for sale at the auction on April 12, 2005, were identified by Vittorio Infanti as the same machinery found to be present on the premises of EKI on June 12, 2006. Tr. 314-332. Mark Gasser testified as to the value of that machinery and equipment. See Tr. 70-77. His testimony in that regard was not challenged by a single question put to him on cross examination, nor was it challenged by a suggestion of evidence offered by Scharpf or Amboy or by a witness who they could have but didn't call to challenge his testimony.

Annexed to the Plaintiffs' Memorandum Regarding Sanction To Be Imposed For The Defendants' Willful Contempt (Ps' Sanction Memo), is a Schedule A which the Court has examined and accepts as an accurate reflection of the value of the property stealthily spirited by the defendants out of the premises of Infanti International, caused to be unavailable at the auction sale and thus flagrantly and contemptuously frustrated the Court's Order and causing damage to the Receivership estate in the sum of $777,400, for which Amboy and Scharpf are jointly and severally liable. The superiority of Gasser's claim to those monies having been irrevocably established, judgment is hereby directed to be entered in favor of the plaintiffs against Amboy and Scharpf, jointly and severally, in the sum of $777,400.

The overwhelming and undisputed evidence recited in the Court's Order of June 2, 2008, compelling the conclusion that Sharpf knowingly and intentionally subverted the integrity of the auction sale would appear to be, in the defendants' view, fantasy and not to be taken seriously. Given the court's findings of fact and conclusions of law in the matter, they shamelessly purport to advise the Court that "The appropriate remedy here

is to auction off whatever property the Court <u>thinks</u> was removed from the premises prior to the auction. This can be accomplished by directing <u>the parties who removed</u> [the] assets . . . to return them to the Receiver . . . . The <u>only damages</u> suffered was damage to the estate from the deprivation of auctioning off all of the assets of Infanti International." (Def. Memo at 9-10). The damages that flowed from their contemptuous conduct were considerably more than that.

That a Receiver of the assets of Infanti International had been appointed by this Court and that the auction sale was directed to be conducted by the Receiver by Order of this Court was known to Amboy and Scharpf is not disputable. They knew and should have known absent an inexcusable legal, ethical and moral blindness, that their brazen conversion of those assets have, when revealed, enmeshed the Receivership in the contempt proceedings which inevitably followed upon that revelation. The Receiver, as the Court's representative, and the plaintiffs were both victims of the contemptuous and contemptible obstruction of justice and frustration of the Court's Order. The fees and expenses incurred by the Receiver's counsel as a foreseeable consequence of their conduct should, by any enlightened view of the law, be laid at the door of the defendants.

The firm of Todtman, Nachamie, Spizz & Johns, P.C. ("TNSJ") has represented the plaintiffs in their effort to obtain satisfaction of the $15 million judgment awarded them nearly 13 years ago and in their effort to thwart the many schemes to evade the payment of that judgment which have heretofore been described. The defendants' recklessly brazen sabotage of the Court ordered auction sale could not have been undertaken without the knowledge that the plaintiffs, who had over the years spared no

effort or expense to vindicate their rights, would spare no effort or expense to expose and prove that sabotage. Following their conversation with Vittorio Infanti in November 2005, at which their suspicion of a flawed auction sale was confirmed, the Gassers and their attorneys indeed spared no effort and expense to prove it. The investigation conducted was extensive and left no stone unturned. An Order of this Court reopening discovery led to interviews with numerous witnesses and numerous depositions. A Court ordered inspection of the premises of Infanti International was made and countless photographs of machinery and equipment, of adjoining properties on which was stored the truck in which the machinery and equipment was wrongfully removed were methodically offered and received in evidence at a hearing at which upwards of nine witnesses testified over a period of two days. A naked and unadorned statement of "countless exhibits," "numerous interviews and depositions," the "testimony of many witnesses at a two day hearing," cannot adequately convey the time, the effort and the resources that were required to present in a courtroom in an organized, coherent way, the evidence thus painstakingly assembled. Annexed to the plaintiffs Memorandum Regarding Sanctions is an Exhibit C, a 57 page computerized summary of TNSJ's contemporaneous time records identifying the attorney by whom the services were performed, the time spent on the service described, and the rate at which the attorney's services were billed for the period beginning with the date of the auction sale, April 12, 2005 through July 11, 2008.

Alex Spizz, lead counsel for the plaintiffs, has been a member in good standing of the New York Bar for approximately 35 years. Over the years during which this litigation has been before the Court, Mr. Spizz has impressed me as a skillful litigator

who was thoroughly prepared on the law and the facts pertaining to the issues at hand and who conducted himself in accordance with the highest standards of the profession. His time was billed at $450 per hour in 2004 and increased by 5% each year thereafter until 2007 when it was billed at $520 per hour. Jill Makower, a senior associate, skillfully conducted all the legal research, drafted memoranda of law, motions and assisted in the preparation for arguments before the Court. She has been a member of the Bar for approximately 15 years. Her time was billed at $330 per hour in 2004 and increased yearly reaching $390 per hour in 2007. In awarding attorney's fees to counsel in 2004 following a finding of defendants' contempt, I found then that the fees requested were consonant with those awarded to attorneys of comparable skill and experience practicing in the New York metropolitan area and make the same finding now.

In approving the hourly rate at which plaintiffs' counsel bill for services rendered, the Court is mindful of <u>Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany</u>, 493 F.3d 110 (2d Cir. 2007), and of the more recent <u>Simmons v. New York City Transit Authority</u>, 575 F.3d 170 (2d Cir. 2009). It is mindful of the <u>Johnson</u> factors, the "presumptively reasonable fee" standard which, distilled to its essence, asks "what a reasonable paying client would be willing to pay." Implicit in that formulation is the assumption that the client wishes to spend "the minimum necessary to litigate the case effectively." That assumption may be questioned in any given case and is in this one. The plaintiffs have spared no expense in pursuing the justice which they deeply felt is their due, whatever its cost and it is clear that the client would have paid the fees for which they were billed. Counsel enlisted on behalf of these plaintiffs in 2003. The

recitation of the litigation that followed the filing of their complaint nearly six years ago barely tells the story that is told by 465 entries on the docket sheet. The plaintiffs are not from this district. They live and work in Ohio. Their choice of counsel was made in the belief that they can represent them effectively. That belief and that choice has been vindicated by the success achieved in overcoming every obstacle devised to frustrate the satisfaction of a judgment obtained fifteen years ago. This surely is that "unusual case" in which a litigant demonstrates that [his] selection of counsel was "reasonable under all the circumstances." If the presumption in favor of the application of the forum rule is at all applicable here, that presumption, given the context of this case, has persuasively been rebutted. The Gassers have pursued this protracted and tortuous litigation not because they chose to, but because they were driven to by these defendants. They did not have the defendants' pocketbook in mind beyond the amount of the judgment they were awarded many years ago. It is also plain that they did not have their own pocketbooks in mind as their persistent determination to vindicate their rights and their confidence in the judicial system in pursuit of them makes exquisitely manifest. It might correctly be asked what right or fundamental notion of morality entitles a wrongdoer to require that his victim ride in a sedan when he can afford to ride in a limousine. To posit the assumption that the victim chose the limousine with the thought that the defendant will be required to pay for it is to assume his certainty that he will be the successful party and ignores the risk that he will lose, a risk which inheres in every litigation.

It is appropriate and relevant to be mindful of the long accepted principle that as regards damages, a defendant takes the plaintiff as he finds him, sometimes stated

metaphorically as the principle of the "eggshell skull." The defendants here didn't fortuitously "find" the plaintiffs. They were aware that throughout the years of litigation the plaintiffs were traveling from Ohio and back, appearing at every proceeding necessitated by the defendants' intent to obstruct the enforcement of their judgment. It was the defendants' callous disregard of the Court's Orders that was responsible for the expense incurred and the "mere gnashing of judicial teeth should not be the sole response" (United States v. Capra, 372 F. Supp. 609, 615 (S.D.N.Y. 1974)) to the defendants' nickel and diming those travel related expenses they caused to be incurred. If, indeed, "the life of the law has not been logic, it has been experience," O.W. Holmes, The Common Law 1 (1881), then the limitations upon one's choice of counsel by geography and upon the necessarily incurred expenses which are commensurate with one's station in life is, respectfully, not supported by either logic, experience or justice.

The defendants' objection to some portions of the time sheets in support of the fee request include assertions that some of its entries are vague and not sufficiently descriptive of the subject of the services provided and that the services claimed for were not rendered in the context of the contempt proceedings.

An examination of the 57 page record of time spent, services rendered and by whom, conveys a graphic picture of the monumental work and effort devoted to exposing the defendants' contemptuous obstruction of justice, the compliance by that record with the requirements of New York State Association of Retarded Children v. Carey, 711 Fed. 2d 1136 (2d Cir. 1983), and the meritlessness of the defendants' objections.

Mindful of the egregiousness of the contempt, the willfulness, stealth and intent

which was inherent in it, counsel fees in the sum of $419,512.05 are awarded to the plaintiff and a judgment in that amount is hereby directed to be entered against Amboy and Scharpf jointly and severally.

Amboy National Bank's Opposition to Plaintiffs' Fee Application (Def. Opp.) is bottomed, essentially, on the assertion that the entries of items for which compensation is claimed are not properly documented, are vague, fail to identify the topic discussed and the subject matter, e.g., "Conference with Chambers; Telephone Conference with S. Goldberg, Attorney for Receiver," or are for work unrelated to the contempt proceeding (Def. Opp. at 10-12). They object, for example to fees sought to be recovered for the "time Mr. Spizz and another attorney spent meeting with Infanti, the admitted thief, and his attorney." Ignored is the undisputed testimony that it was Infanti's confirmation of Gassers' belief that the auction sale was subverted and his revelation of the details as to how that was accomplished without which the subsequent investigation and the findings of contempt could not have occurred. The time spent with Infanti was crucial to the unfolding of all the subsequent events and the proceedings that followed. The fees thus incurred were plainly compensable. The characterization of Infanti as an "admitted thief" elides the uncontroverted testimony that Infanti's role in this sordid affair was played at the direction of Scharpf. See, e.g., Tr. 298-99, 356-57. "Plaintiffs bear the burden with respect to the accuracy and reasonableness of the fees sought; it is the plaintiff who must suffer the consequences of their failure of proof," declare the defendants (Def. Opp. at 12), blithely ignoring Bigelow, Grace, Raisevich, if resort were to be had to them in response. But resort to them is not needed. A conscientious examination of the voluminous schedules and exhibits presented in support of the sums

26

claimed, compel the conclusion that the reasons advanced in opposition are groundless.

The costs and disbursements for which plaintiffs claim to be reimbursed are itemized on Schedule D annexed to the Plaintiffs' Memorandum Regarding Sanctions To Be Imposed . . . . (Pl. Sanc. Mem.). The list consists of 27 items totaling $46,688.17. The invoices substantiating those costs are provided in Exhibits A through O. In the interest of not unduly burdening this Memorandum and Order, the Court will address only those items to which the defendants have objected or otherwise opposed. The general objection to all the items is based on the assertion that the "plaintiffs have failed to submit an attorney affidavit to accompany the breakdown of costs,; the 'costs' are not itemized by the matter for which services were rendered on behalf of the plaintiffs." (Def. Opp. at 5). An affidavit was submitted by Alex Spizz. If the assertion that the absence of counsel's affidavit and of itemization of the matter for which services were rendered implies that the plaintiffs are seeking to be reimbursed for matters for which they are not entitled given the conduct of the defendants which brings us here, such an assertion can only be regarded as scurrilous.

It is hornbook law that the tort of conversion is committed by one who exercises unlawful dominion or control over property possessed by another. That is precisely what occurred here.

The list of costs and expenses in Schedule D is divided into two categories. In one, 100% of the items are attributed to the proceedings leading up to the finding of contempt and the investigation which uncovered the evidence which compelled that finding. In the other category, 67% of the costs and expenses attributable to the investigation and the contempt proceeding are claimed. In paragraph 28 at p. 10 of an

27

affidavit of Alex Spizz In Reply to the Opposition to the Plaintiffs' Fee Application, he explains that Exhibit "O" reflects the actual time for which TNSJ billed the Plaintiffs for the relevant period. The total amount billed was $606,207.35. Schedule C identifies the legal fees attributable to the contempt and related proceedings as being $406,160.55. The percentage attributable to the contempt and related proceedings was, therefore 69% of $606,207.35. The Plaintiffs' however, attributed 67% of that amount to the contempt and related proceedings and request reimbursement for $45,113.89. All of the costs and expenses listed on Schedule D were incurred in the investigation and proceedings leading up to the finding of contempt and are supported by invoices in Exhibits A-O.

A review of those items warrants the inference that most are surely attributable to the investigation and the proceedings that followed and that 67% of the costs regarding them is reasonable and quite possibly, underestimated. Given the very large number of photographs and charts that were received in evidence and the other items incident to these proceedings, the inference regarding the photocopying charges is warranted. The comprehensive memoranda of law submitted by the plaintiffs on every relevant issue that has and may have been presented and the research reflected in those memoranda supports the inference that the Westlaw charge is a justifiable one. Those are the two largest expenditures for which a claim of reimbursement for less than 100% has been made and which will be allowed.

The defendants' objection to the claimed reimbursement for Westlaw research is flawed. Missing from the authorities cited in support of their opposition is Arbor Hill Concerned Citizens Neighborhood Assn. v. County of Albany, 369 F.3d 91, 97-98 (2d Cir. 2004). The Court there decided that reimbursement for online legal research is

proper "because the use of such servers likely reduces the number of hours required for an attorney's manual search," and because "such services presumably save money by making legal research more efficient." Although the cost for such services should be included in the fee award where the client is billed for the cost of such research, the Plaintiffs' counsel has represented that the Westlaw research was not accounted for in counsel's hourly rates. The invoices submitted reflect that the costs were charged to and paid by the plaintiffs. (Plaintiffs' Memorandum of Law in Reply to the Opposition to Plaintiffs' Fee Application at p. 6). See also Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC, 549 F. Supp.2d 274 (E.D.N.Y. 2008); Aiello v. Town of Brookhaven, 2005 WL 1397202 at * 8 (E.D.N.Y. 2005).

The defendants' only objection to the $14,360 cost for "reporting services" is that there is "no indication of services provided" and "the referenced invoices are not attached." Opposition of Amboy to Plaintiffs' Fee Application Pursuant to Fed. R. Civ. P. 54 at 14. The supporting invoices are, however, attached and plainly indicate they were in relation to Gasser Chair v. Infanti.

The defendants' same objection to the claimed reimbursement for Demovsky Lawyer Service, namely that there are no invoices attached and no indication of the services provided, is belied by Exhibit K which are the supporting invoices and reflect the legend of the services rendered, namely, the service os subpoenas in connection with discovery and contempt proceedings.

The defendants' mistakenly object to $5,023.16 for "ground transportation" for which only $465.16 was claimed and was disallowed.

The plaintiffs seek reimbursement for the expenses they incurred and which were

29

directly attributable to the intentional subversion of the Court ordered auction sale. Those expenditures were for the investigation of the facts which led to the proof of that subversion and the proceedings before the Court which resulted in the findings of contempt.

The plaintiffs also seek reimbursement in the sum of $27,708, representing out-of-pocket costs and expenses incurred by Mark Gasser and directly attributable to the events leading to the proceeding which dictated the finding of contempt. Included are the travel and lodging expenses incurred by him in the sum of $20,786; $4,650 paid to a computer consultant retained to obtain Sharpf's emails from Amboy's server and $2,272 for trial transcripts. The sums paid the computer consultant and the court reporter for trial transcripts cannot be disputed as costs necessarily and reasonably incurred in exposing Scharpf as the contemnor that he is.

The defendants object to the reimbursement sought as being "grossly unreasonable and well beyond the type of costs anticipated by Fed. R. C. P. 54(d)." Even the most cursory reading of § 54(d) fails to reveal the basis for that assertion. That Rule simply provides, in relevant part, that "Unless a federal statute, these rules or a court order provides otherwise, <u>costs</u> - other than attorney's fees - <u>should be allowed to the prevailing party</u>." (emphasis added). The defendants have identified no federal statute, rules or court order that has "provided otherwise." If, in asserting that the reimbursements sought are beyond the anticipated scope of Rule 54(d), they are obliquely referencing 28 U.S.C. § 1920 which lists the costs that may be taxed by the judge or the clerk of the court, they are misguided. Rule 54(d) explicitly excludes attorney's fees as does § 1920. On the contrary, those reimbursements are consistent